**Harry URVANT, Plaintiff,**

v.

**IMCO POULTRY, INC., as successor in interest to Neuhauser Hatcheries, Inc. as successors in interest to Koppenhofer Brothers Company, a corporation, as successors in interest to Koppenhofer Brothers, a partnership, Defendant.**

**No. 67 C 1207.**

United States District Court, E. D. New York.

Jan. 2, 1970.

---

Harry T. Sherman, New York City, for plaintiff.

Donovan, Leisure, Newton & Irvine, New York City, for defendant.

## FINDINGS OF FACT AND ORDER FOR JUDGMENT

DOOLING, District Judge.

The following are the findings of fact herein:

1. Koppenhofer Brothers was incorporated on July 28, 1955. Prior to that time Koppenhofer Brothers conducted business as a partnership.

2. Neuhauser Hatcheries, Inc. acquired the stock of Koppenhofer Brothers, Inc., on February 1, 1965.

3. Koppenhofer Brothers, Inc., was merged into Neuhauser Hatcheries, Inc., on February 28, 1967.

4. IMCO Poultry, Inc., acquired substantially all of the assets and assumed certain specific liabilities of Neuhauser Hatcheries, Inc., on March 1, 1967.

5. The business of each of the foregoing companies was to purchase eggs from the producers thereof, and then to process, package and resell same to retail and wholesale outlets.

6. Plaintiff introduced the H. C. Bohack Company, Inc. (hereinafter "Bohack") to Koppenhofer Brothers, a partnership (hereinafter "Koppenhofer"), as a buyer for eggs processed by Koppenhofer.

7. Plaintiff introduced Adria Farms, Inc. (hereinafter "Adria") to Koppenhofer as a buyer for eggs processed by Koppenhofer.

8. Koppenhofer first shipped eggs to Bohack in the summer of 1960.

9. Koppenhofer first shipped eggs to Adria on or about August 1, 1960.

10. Koppenhofer and its successors have continuously shipped eggs to Bohack and Adria from on or about August 1, 1960, to the date of the complaint herein.

11. Up to February 27, 1967, plaintiff received a commission of ½ cent upon each dozen of eggs which Koppenhofer, Koppenhofer Brothers, Inc. and Neuhauser Hatcheries, Inc., shipped to Bohack and Adria.

12. The total amount of commissions received by plaintiff is $110,505.62.

13. The last shipment of eggs upon which a commission was paid to plaintiff was shipped in the last week of February, 1967.

14. From the date of said last shipment to September 30, 1967, IMCO Poultry, Inc., had shipped to Bohack and to Adria a total of 2,090,299 dozen eggs.

15. In the summer of 1960 after a meeting at Koppenhofer's place of business in Ohio at which plaintiff sought out Koppenhofer and a later meeting in New York at the office of H. C. Bohack & Co., Inc., Koppenhofer agreed to sell eggs to Bohack and to pay a commission to plaintiff of one-half a cent on each dozen eggs sold. It appears that the understanding between plaintiff and Koppenhofer, although it arose in the Bohack context and with Bohack as a first and probably principal customer, was a general arrangement extending to any business that plaintiff brought to Koppenhofer and that Koppenhofer accepted.

16. The parties agree that plaintiff had with him in the first interview at Koppenhofer's office in Ohio an unsigned draft form of agreement (Exhibit 2) which he wanted Koppenhofer to sign; plaintiff made the sense of that contract clear to Koppenhofer and Koppenhofer assented to the idea of contracting on its general terms if Koppenhofer decided to try to enter the New York market and to take plaintiff on as its commission agent.

17. The draft agreement discussed at the first meeting read

"It is our further understanding that on all sales made to customers not previously sold by you, that my commission will be due and payable for so long as you will continue to sell that particular customer."

18. Plaintiff made plain to Koppenhofer (and Koppenhofer neither directly controverts nor specifically recalls it) that the commission was to apply as long as a customer introduced by plaintiff continued as a customer.

19. Plaintiff and defendant Koppenhofer did agree to go forward on the deal and agreed orally that plaintiff's commission of a half cent a dozen would be due on all of Koppenhofer's sales to customers not previously sold by Koppenhofer so long as Koppenhofer continued to sell the customer. Koppenhofer and plaintiff did not discuss or agree upon what would happen if Koppenhofer stopped shipping to one of plaintiff's accounts and at a later date resumed shipments to that account. The oral agreement between plaintiff and Koppenhofer was the only agreement of plaintiff with a supplier that was not in writing.

20. In addition to Bohack plaintiff brought to Koppenhofer as egg customers for some period of time Adria Farms, Allendale Farms, Garden State Farm, Joseph Kalb, Jersey June and Quality Egg Co. The present litigation refers only to sales made to Bohack and to Adria.

21. Both parties to the arrangement were clear that the following were elements of their relation.

A. Urvant could stop representing Koppenhofer any time he chose and Koppenhofer could discharge Urvant at any time it chose to do so in the sense that Urvant could elect to stop rendering and Koppenhofer to stop accepting whatever it was that constituted the continuing subject matter of any contract that there was between the parties.

B. Koppenhofer was not by virtue of its arrangement with Urvant committed to accept any order tendered by any customer introduced by Urvant and could at anytime reject, or discontinue filling, orders tendered by any customer procured by plaintiff for Koppenhofer.

C. No customer procured by plaintiff, such as Bohack, Adria, Allendale and so forth, was committed to submit orders to Koppenhofer directly or through plaintiff but was at all times free to order or not to order from Koppenhofer and to divide its business between Koppenhofer and other suppliers.

D. Plaintiff had no right to insist that Koppenhofer fill orders presented by customers procured by plaintiff either in the first instance or in the case of repeat orders.

E. Plaintiff was not expected to give all of its egg business and all of its egg customers to Koppenhofer and in fact plaintiff had other egg customers whom it represented in selling eggs into the New York market and in selling eggs to Bohack.

F. Bohack was free to and did buy eggs from other suppliers than Koppenhofer through other brokers than plaintiff.

G. Koppenhofer was free to and did sell eggs in the New York market to customers other than those introduced by plaintiff.

22. There was no written contract between plaintiff and the defendant nor was there any note or memorandum of such contract signed by Koppenhofer or any of its successors in interest including the defendant IMCO POULTRY, INC.

23. At the initial meeting between plaintiff and Donald Koppenhofer, then President of Koppenhofer Bros., the question of the signing of a written contract came up, was directly discussed and Donald Koppenhofer explicitly refused to sign any contract or commit his firm in writing; the reason for this was that Koppenhofer had on a previous occasion sold eggs into the New York market and had an unhappy experience because of the insistence of the market on special standards of size, grading and quality.

24. The question whether or not Koppenhofer would enter into a contract which contemplated its entry into the New York market presented substantial problems to Koppenhofer; the delivery of the eggs involved a 650 mile road trip and in order to have a successful operation Koppenhofer had to be guaranteed that the shipments were at least a certain size, say, roughly 400 cases a shipment; in addition the grades called for and the egg sizes and their distribution over the total quantity had to be such as to be compatible with Koppenhofer's supply; and finally price had to be satisfactory. These were grounds for substantial hesitation on Koppenhofer's part and Koppenhofer did not conclude that the program would be desirable until after the New York meeting in the summer of 1960.

25. Koppenhofer had never previously sold eggs to Bohack or Adria or any of the other customers named above as having been introduced to it by plaintiff.

26. Koppenhofer and its successors in interest have shipped eggs to Bohack uninterruptedly since 1960 and are still shipping eggs to Bohack; shipments of eggs to Adria Farms continued until November 1966.

27. In or about the year 1964 because of a controversy that apparently arose between the Bohack buyer and plaintiff, plaintiff was in effect excluded from Bohack premises and for some time that status continued. For a period of not more than several weeks, after a change in buyers at Bohack, plaintiff was at Bohack in a supplier's sales representation capacity and thereafter he again was excluded in circumstances hereinafter indicated.

28. At the beginning of the relationship with Koppenhofer and until the interruption indicated just above, the pattern of plaintiff's activity had been the following: *First*, in the latter part of the afternoon about three times a week plain-

tiff would go to the Bohack office and work out the size of the order to be given to Koppenhofer; plaintiff would then phone Koppenhofer directly from the Bohack office collect and give the order to Koppenhofer; on the *second* following day the order would be delivered to Bohack's central warehouse, usually at or before eight o'clock, and plaintiff would usually be there to check out the sizing, and quality grading of the eggs, discuss any such matters as then came up, and, at times, hire unloaders. Plaintiff did no warehousing, billing or collecting; Koppenhofer at all times shipped its eggs directly to Bohack's control warehouse and billed Bohack direct.

29. After the controversy between the Bohack buyer and plaintiff the activities just described altogether ceased.

30. After the later resumption of plaintiff's activities at Bohack's premises, and either late in 1964 or possibly 1965, Bohack called in Koppenhofer and directed Koppenhofer to dismiss Urvant on the ground that Urvant was not performing any service; Bohack insisted on the dismissal of plaintiff in order to eliminate the commission cost which it saw as having no counterpart in sales service.

31. Thereafter Koppenhofer dealt directly with Bohack and continued to pay the commission of ½ cent a dozen to plaintiff.

32. Commencing at a point some time after the first interruption in plaintiff's sales activities at Bohack arising out of the controversy between plaintiff and the Bohack buyer, plaintiff at the request of Koppenhofer, commenced to procure backhaul loads for Koppenhofer's otherwise empty trailer trucks which had to be returned to Ohio after each egg delivery.

33. Plaintiff procured backhaul loads for Koppenhofer on down until February of 1967; Koppenhofer was not solely dependent upon plaintiff particularly in the later period for getting backhaul freight business; the drivers themselves could obtain such business, and in an in-definite number of instances apparently preferred to get backhaul jobs for themselves, because of their desire to get complete loads that would involve a single delivery point rather than loads which required deliveries at several points.

34. Plaintiff's work in connection with the backhaul freight business appears to have occurred in the period April 19, 1965 through February 15, 1967, and the backhaul compensation for each truckload ran up to as much as $250 or $260 a truck and could be materially less though usually at least approaching $200.

35. Koppenhofer sent to plaintiff with the monthly remittance of commission memoranda of the backhaul jobs and the amount received on them.

36. On February 23, 1967, defendant notified plaintiff that it had acquired the assets of Koppenhofer's successor in interest and that as a result plaintiff's services to Koppenhofer in connection with the distribution of that company's products were no longer required, and plaintiff was advised that the employment of such services were terminated as of March 1, 1967.

37. Defendant paid to plaintiff all commissions due with respect to shipments made through the last February 1967 shipment and has not made any payments since that time although it has continued to sell eggs in substantial quantities to Bohack and Adria.

38. There was no formal agreement with respect to the backhaul work and no separate consideration was ever allocated to that work, and there is no evidence as to any terms of agreement on compensation for the backhaul work other than what can be inferred from the requests for the services, their rendering and the relation if any of the continuance of the payment of the commission to the backhaul work.

39. Donald Koppenhofer believed that his firm was obligated to continue to pay the half cent commission on sales to Bohack and Adria under the terms of its arrangement with plaintiff so long

as it continued to sell eggs to Bohack and Adria. When plaintiff protested the stoppage in commission payments to Donald Koppenhofer, Mr. Koppenhofer declined to continue payments on the ground that he had no authority to do so. The initiative in terminating the payments came from an executive of International Milling Company, Inc. after that Company acquired the Koppenhofer business.

40. Other purchasers of eggs from Koppenhofer who had been introduced by plaintiff placed their egg orders direct with Koppenhofer in principal or in substantial part and continued to pay commission on the orders; that occurred in the cases of Adria and Allendale.

## CONCLUSION OF LAW

■ It is concluded that the agreement or promise sued upon was unenforceable under New York Personal Property Law, McKinney's Consol. Laws, c. 41, § 31, subdivision 1, since there was no note or memorandum of it in writing subscribed by the defendant or its lawful agent and the agreement or promise

"By its terms is not to be performed within one year from the making thereof * * *."

Put most favorably to plaintiff, the contract was this: it was fully performed by plaintiff whenever he produced a customer willing to buy to whom defendant was willing to make a sale; no matter how many such customers plaintiff produced and defendant made initial sales to, all the participants were free to quit their participations at any time; that is, defendant was free to terminate plaintiff's services as a finder of new customers, and to decline all further orders of plaintiff's earlier produced customers; plaintiff was free at any time to take his old and any new-found customers to any other supplier; plaintiff was free to stop turning over new-found customers to defendant at any time; and the customers could neither insist that defendant fill their further orders nor yet were they bound either to defendant or to plaintiff to tender any future orders to defendant for filling or to plaintiff for placement with any other supplier. But, by the essential nature of the contract as one to pay a commission of one-half cent a dozen on sales made to customers introduced by plaintiff so long as defendant continued to sell the customer, it was a contract that was not to be performed within one year from the making of it. The promise sued upon by its terms and nature continued in full legal force and effect without limit of time and without terminability except by a bilateral agreement between the parties made upon a sufficient consideration running from defendant to plaintiff to release defendant from the promise despite its enduring legal effect.

If plaintiff and defendant elected all the terminating alternatives that were in their control within a year, the critical promise, the one sued on, necessarily survived by its terms unimpaired to constrain the defendant's freedom of action and as a continuous investiture of right in plaintiff: when at any time a customer introduced by plaintiff proffered an order to the defendant, the defendant had either to accept that order and pay the commission or forego the order, no matter how acceptable it was in commercial terms; plaintiff continuously possessed the correlative right to the commissions on every accepted order even though he had no right to insist that any order be accepted. The contract did not mean that one rejection of an order by defendant freed him from the promise and enabled him either to reject the next order or to accept it without paying a commission.

■ That is the meaning of plaintiff's contract, stated most favorably to plaintiff, and that interpretation and stated consequence do not involve any circularity of assertion but precisely what plaintiff does and, indeed, must argue. The close weft of the New York cases requires the conclusion that the Statute of Frauds "voids" the promise sued upon,

and that conclusion reflects New York's rejection of the "completed unilateral performance" exception to the operation of the statute stated in Restatement Contracts, § 198 (and see Restatement of the Law Second, Contracts, Tentative Draft No. 4, 1968, § 198(b)) *Cf.* Jaffe v. New York Towers, Inc., City Court, N.Y.Co. 1951, 108 N.Y.S.2d 193, 196; Mosberg v. Judson Enterprises, Inc., Sup.Ct., N.Y. Co. 1955, 139 N.Y.S.2d 780.

Cohen v. Bartqis Bros. Co., 1st Dept. 1942, 264 App.Div. 260, 35 N.Y.S.2d 206, aff'd, 1943, 289 N.Y. 846, 47 N.E.2d 443, found unenforceable a similar promise *to pay a commission on all orders "placed" by a named customer at any time whether or not defendant still employed plaintiff;* by its terms the promise continued as long as the customer stayed in business and the possibility that the customer might have quit business within the year did not save the promise, for that kind of contingency, like the death of a contract employee, does not fulfil the contract but defeats its aim. Elsfelder v. Cournand, 1st Dept. 1945, 270 App.Div. 162, 59 N.Y.S.2d 34, followed Cohen in declining to enforce a promise to pay commissions on re-orders received after the termination of plaintiff's employment: the employment contract was terminable on thirty days' notice. See also Sack v. Beasley, 1st Dept. 1953, 282 App.Div. 153, 122 N.Y.S.2d 174; Archer v. Hamilton Wright Organization, Inc., Sup.Ct., Nassau Co. 1956, 155 N.Y.S.2d 556.

Martocci v. Greater New York Brewery, 1950, 301 N.Y. 57, 92 N.E.2d 887 held the Statute of Frauds applicable to a promise to pay commissions without limit of time on all sales made to and paid for by the customer. The Court was clear that if the contract had "included an event which might end the contractual relationship of the parties within a year, defendant's *possible* liability beyond that time would not bring the contract within the statute." (Emphasis supplied.) But the Court went on: "Since, however, the terms of the contract are such that the relationship will continue beyond a year, it is within the statute, even though the continuing liability to which defendant is subject is merely a contingent one. The endurance of defendant's liability is the deciding factor. The mere cessation of orders from [the customer] to defendant *would not alter the contractual relationship between the parties;* it would not constitute performance; plaintiff would still be in possession of his contractual right, though it may have no monetary value, immediately or ever." (Emphasis supplied.) The Court found the writings, sufficient under the Statute.

Nat Nal Service Stations v. Wolf, 1952, 304 N.Y. 332, 107 N.E.2d 473 marks no retreat from or change in the law: there the parties agreed that on all gasoline orders that plaintiff placed with defendant, the defendant would give plaintiff the same discount he (a quantity buyer) received from the supplier, so long as plaintiff bought no other gasoline than that of defendant's supplier; the Court held the Statute inapplicable for the Court interpreted the arrangement as a completely revocable one that contemplated a series of utterly discrete contracts which neither party was at any time bound to make or to continue making. Since every contract was a "spot" contract, the Statute was not involved at all: the terms of contracting were standby terms applicable until defendant withdrew them, which he was unilaterally free to do at any time; the discount terms, that is, were not construed as an irrevocable offer to contract made by defendant on a sufficient consideration. In discussing *Martocci* and *Cohen* the Court in *Nat Nal* emphasized that plaintiffs in those cases had fully performed, had fully furnished the consideration for the promised commission (*cf.* Grossman v. Schenker, 1912, 206 N.Y. 466, 468, 100 N.E. 39; Rubin v. Dairymen's League, 1940, 284 N.Y. 32, 37–38, 29 N.E.2d 458) so that there was no escape for the defendants from the duty—without limit of time—to pay commissions on new orders, which, the Court considered, the defendants were not in

any case free to reject so as to avoid their contractual duty.

Does *Nat Nal* imply that there must be a duty to accept orders whenever tendered in order to make the obligation to pay commissions an enduring one rendered unenforceable by the Statute? For in the present case there was no such duty. That pursues the expression of the principle in *Nat Nal* too literally. The Court's point was that since the contracts were no longer executory on the plaintiffs' side in *Martocci* and *Cohen,* the duty to pay commissions arose independently of any further act on the plaintiffs' parts, and by their very terms the promises to pay continued to apply to the defendants' courses of action. The Court said, indeed, 304 N.Y. at 339, 107 N.E.2d at 477, that, "The defendants could not avoid their contractual obligations by refusing to accept orders from the customers [earlier] procured by the plaintiffs." But the test, analytically, is "the endurance of defendant's liability" (to use the *Martocci* language, 301 N.Y. at 63, 92 N.E.2d at 889) and it endures as just as real a continuing contractual liability whether its effect is to precipitate a duty to pay a commission because the commission contract does not admit of the rejecting of commercially acceptable orders or the enduring legal effect of the commission contract is to require the defendant either to reject commercially acceptable business or pay a commission on any accepted orders. The scope of the legal obligation differs, but its endurance as a continuous imposition of legal duty independently of any further act by plaintiff is equally real in all three cases imposing in the one case an unconditional duty to pay commissions on all orders tendered and imposing in the other case an alternative duty either to pay the commission or to forego the commercially acceptable orders. In each case the defendant is not free of a contract duty; his general freedom to contract is gone, and his conduct continues to be governed by the contract, which plaintiff has fully performed.

Platt v. Whitelawn Dairies, Kings Co., 1956, 3 Misc.2d 19, 150 N.Y.S.2d 391, aff'd, 1956, 2 App.Div.2d 683, 153 N.Y.S.2d 583 makes clear that the first problem is determining the content of the commission promise, or, in another view, the scope of the defendant's contractual freedom; there, the commission contract was that if defendant "ceased serving [the customer introduced by plaintiff] for any reason whatsoever, the contract was to terminate upon payment to the plaintiff of all earned commissions." The Court held *Martocci* and *Cohen* inapplicable because, while the contract was indefinite in time, the Court interpreted it as one that would be "fully performed and come to an end" by payment of to-date commissions if *defendant* decided to give up the *customer's* business. The case does not intimate a ruling on what would occur if the surrender of the customer was a subterfuge or was suspiciously temporary; the Court read the contract as dealing with an ascertainable and genuine "cessation of service" and treated the parties as having agreed with each other that their contract would come to its full performance end if defendant "ceased serving" the customer; that act was to discharge the commission promise. It is implied that if the customer later tendered the business anew and defendant accepted it, the meaning of the parties' contract was that the defendant (absent, at least, bad faith) would owe no commission. The rationale of the contract would be that plaintiff by his form of contract recognized that a later renewal (at least if not a commission-evading subterfuge) would be considered due to past performance and market conditions, and not to his introduction. Such a commission promise was therefore held to be performable within a year, since as between plaintiff and defendant the term of their contract could be ended at any time by the defendant's unilateral act of "ceasing service" to the customer.

Zupan v. Blumberg, 1957, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E.2d 819,

emphasizes the significance of the fact that the accrual of commission liability is determined by the act of a third party not under the control of either party to the commission contract: there the claim was that plaintiff solicitor was to receive one-fourth of the fees paid to the defendant advertising agency by an advertiser introduced by plaintiff "for so long as the account was active." The promise was held to be unenforceable under the Statute. Differentiating *Nat Nal* as a case in which the determinants of liability for the discount were wholly in the parties' control, the Court noted that the promise sued upon was not performable within a year for, while defendant could dispense with plaintiff's services as a solicitor of accounts at any time, that would not discharge the duty to continue paying commissions on accounts previously solicited and still active. The Court noted that " * * * a salesman's right to commissions cannot be defeated by the arbitrary refusal of his employer to accept orders * * *." (2 N.Y.2d at 552, footnote, 161 N.Y.S.2d at 431, 141 N.E.2d at 822). The Court quoted from *Nat Nal* language of the Court that had emphasized that in *Nat Nal* neither party could under their arrangement "furnish consideration through performance which will bind the other party for a period beyond the offering and acceptance of a particular order" (304 N.Y. at 340, 107 N.E.2d at 477). In contrast, in *Zupan*, as in the present case, the furnishing of the single consideration, introducing the customer, was the generating source of a continuing duty to pay a commission on each new order accepted without any limit in point of time. See to the same effect as *Zupan*, Nurnberg v. Dwork, 1st Dept. 1960, 12 App.Div.2d 612, 208 N.Y.S.2d 799, aff'd, 1962, 12 N.Y.2d 776, 234 N.Y.S.2d 721; Stone v. Ransel Trading Corp., N.Y.Co. 1959, 16 Misc.2d 758, 185 N.Y.S.2d 13.

North Shore Bottling Co. v. C. Schmidt and Sons, Inc., 1968, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189, like *Nat Nal,* dealt with a case in which, because the parties' arrangement was indefinite as to time and wholly under defendant's control as to duration, the Court found the Statute inapplicable. There defendant made plaintiff its exclusive Queens distributor for as long as defendant sold beer in the New York Metropolitan area. The Statute was held inapplicable since defendant was entirely free to quit the market at any time, and that "would amount to a performance permitted by the contract." The Court noted that *Zupan, Martocci* and *Cohen* were different in kind, for, although sometimes called service contracts of indefinite duration they were, more accurately, "agreements for commissions in procuring customers or orders" in which performance depended upon the will of third parties, not on the will of the parties to the contracts. The Court found significant differences from *North Shore,* in *Zupan, Martocci* and *Cohen, first,* in that each of the latter plaintiffs sought perpetual commissions on the basis of an agreement completely performed on the plaintiff's part when he introduced the customer, so that no continuing performance on plaintiff's part— a safeguard against fraud—was involved, and, *second,* in that the agreements sued on did not contemplate the possibility of termination by either contracting party. The Court observed that it was significant that the Court in *Martocci* had thought a different result would follow if the terms of the commission contract included an event which might end the contractual relationship of the parties within a year; in that case the defendant's possible liability beyond the year would not bring the contract within the statute. In *North Shore,* as in *Whitelawn,* the contract was read as dealing with an ascertainable and significant cessation of activity on the defendant's part which the parties to the commission contract treated as setting the outer time limit of their relation.

The cases are insistent that the Statute applies where nothing in the

commission contract contemplates its fulfillment within a year and no term or event controlled by the parties will bring the contract to an end with its promises discharged. In that perspective, the commission cases from *Cohen* through *Zupan* and *Nurnberg* under the reasoning of all the cases from *Cohen* through *North Shore* are clear cases for application of the Statute since in all of them the essence of the promise sued on is endurance of the promise without limit of time as the earned consideration for the plaintiff's already rendered full performance. It is not an answer to say that the commission promise is not within the Statute because the defendant could end its obligation unilaterally at any time by repeatedly and insistently refusing to do further business with the customers produced. The whole policy of the Statute of Frauds is to require a writing to establish the existence of a contract the effect of which extends beyond a year, and the very statement that rejection of orders will end the obligation to pay commissions discloses that the contract liability endures to compel the discontinuance of sales, an alternative as economically real as the commission-payment alternative. The upshot is that the liability endures and continues to exact the alternative performances of payment of commissions or surrender of commercially acceptable orders.

It is important to recall that such "perpetual" promises are valid and enforceable, as *Martocci* holds; it is because they are valid that they raise the Statute of Frauds question. It is difficult to imagine a species of promise to which the policy of Personal Property Law § 31, subdivision 1, is more certainly applicable.

It follows that defendant is entitled to judgment.

Accordingly it is

Ordered that the Clerk enter judgment that plaintiff take nothing and that the action is dismissed with costs as taxed by the Clerk.