**JILLCY FILM ENTERPRISES, INC., Plaintiff,**

v.

**HOME BOX OFFICE, INC., Defendant.**

**No. 83 Civ. 2714.**

United States District Court, S.D. New York.

Feb. 29, 1984.

Gold, Farrell & Marks by Henry Lukas, New York City, for plaintiff.

Moses & Singer by Ronald L. Cohen, New York City, for defendant.

## OPINION

MOTLEY, Chief Judge.

Plaintiff, Jillcy Film Enterprises, Inc., is a Canadian corporation that was formed for the purpose of producing the film documentary in question in this case. Defendant, Home Box Office, Inc. (HBO), is a New York corporation which operates a cable television network in the United States. Jillcy has sued HBO for breach of contract and HBO has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) and 56.

1. Exhibit A to Complaint.

## BACKGROUND

HBO and a Canadian corporation not a party to this suit had made arrangements for a feature-length film entitled "The Terry Fox Story" to be made and broadcast on HBO's nationwide pay-television network. The principals of the then-unformed Jillcy Film Enterprises, Inc., approached HBO with a proposal to make a film documentary of the making of "The Terry Fox Story."

Jillcy was formed and executed a letter agreement with HBO on July 21, 1982.[1] The relevant terms of the letter agreement were:

a. HBO gave Jillcy the right to film a documentary of the filming of "The Terry Fox Story."

b. Within six weeks after the commencement of the film, Jillcy was to submit some rough footage of the documentary that had been filmed up to that point.

c. For a period of up to 90 days after the delivery of that rough footage, the parties agreed to "negotiate exclusively and in good faith with respect to the terms and provisions relating to the distribution, exhibition or other exploitation of the documentary."

d. Finally, the parties agreed that "in the event that you and we do not reach agreement," Jillcy would not use the documentary in the United States for the duration of the copyright in the documentary.

On October 5, 1982, both parties executed another letter agreement extending the delivery date of the first assemblage of rough footage until November 5, 1982.[2] The rough footage was delivered on November 4, 1982. Negotiations took place for some time, although it is not clear when they began, with respect to a long term production and licensing agreement.

On December 1, 1982, a handwritten memo appeared on a page from a note pad with the name "Meg Louis" printed on the

2. Exhibit B to Complaint.

top.[3] The memo was neither signed nor addressed to anyone. On it appears the date and the words "deal closed" and notes concerning some terms.

Mr. Spivak, Jillcy's counsel, sent a letter dated December 27, 1982, to Margret Louis, HBO's associate director of business affairs, containing 67 proposed changes in a draft production and licensing agreement.[4] Among them was included one proposal that Jillcy receive its initial payment regardless of whether or not the Agreement was executed. The letter closed with a request that Louis call Spivak "so that we may expeditiously consummate the Agreement."

Jillcy contends that on January 7, 1983, an oral agreement was reached, the terms of which were embodied in the Production and License Agreement.[5] HBO denies this contention, but assumes it to be true only for the purpose of its motion and argument based on the statute of frauds.

On January 17, 1983, another handwritten memo appeared on a page from the note pad of "Meg Louis."[6] To it was attached a copy of the unexecuted agreement. The memo was signed "Meg" and addressed to "Janet" directing her to "make payment ... as soon as possible" pursuant to a specified provision of the Agreement which provided for payment upon "approval by HBO of selected footage." On the bottom of the memo appears another handwritten notation, "1/18 Meg says don't pay—deal being *pulled.*" (Emphasis in original.) This notation is neither signed nor initialed and its author is therefore unidentified.

Louis sent a letter dated January 18, 1983 to Mr. Saperia, another counsel for Jillcy, in which she indicated she was enclosing three unexecuted copies of the agreement with revisions pursuant to recent conversations.[7] She requested their prompt signature by Jillcy and return to HBO, "after which I will forward a fully executed copy ...." The agreement did not contain Jillcy's proposal referred to in its December 27, 1982 letter but rather provided that Jillcy's initial payment be made no more than 10 days after execution and delivery of the agreement to HBO.[8] That same day, Jillcy delivered more rough footage to HBO where it was screened but received an unfavorable review by HBO employees.

The next day, on January 19, 1983, an HBO employee called one of Jillcy's attorneys and told him that the deal was off. This oral notice to Jillcy apparently was given prior to the receipt by Jillcy of the January 18, 1983, transmittal letter and execution copies of the agreement which had been sent by Louis. Approximately two weeks after the receipt by Jillcy of the oral notice and the unexecuted agreement, Jillcy nevertheless executed the agreement and returned it to HBO. HBO has never executed the agreement.

Jillcy thereafter sued HBO seeking damages caused by HBO's alleged breach of the purported oral agreement of January 7, 1983, and damages caused by HBO's alleged breach of the July 21, 1982 letter agreement to negotiate in good faith. HBO has moved to dismiss both claims.

## DISCUSSION

The New York statute of frauds provides in pertinent part:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

---

**3.** Exhibit H to Lukas Affidavit.

**4.** Exhibit B to Cohen Reply Affidavit.

**5.** Exhibit C to Complaint.

**6.** Exhibit L to Lukas Affidavit.

**7.** Exhibit M to Lukas Affidavit.

**8.** Par. 3(a)(i) of the Agreement.

N.Y. General Obligations Law § 5–701. It is undisputed by Jillcy that the agreement contains several provisions which, by their terms, will require more than a year to fully perform. It would appear, therefore, that because the contract is not capable of full performance within a year, it is within the statute of frauds and is unenforceable.

The issue is complicated, however, by the existence of termination clauses in the agreement. For example, either party has the option to terminate the agreement in the event of "accidents, riots, strikes, epidemics, Acts of God, or any other legitimate conditions beyond the affected party's control (hereinafter 'force majeure')."[9] HBO has the option to terminate the agreement in the event Jillcy's property is attached or comes under the possession of a trustee, receiver, or assignee for the benefit of creditors, or upon the filing of proceedings for bankruptcy, dissolution, or liquidation, or if Jillcy is insolvent.[10]

The legal effect of such clauses with respect to the statute of frauds is a controversial area of law.[11] New York has adopted the approach that, in certain circumstances, a termination clause may operate to take the contract out of the statute of frauds. The cases are not altogether clear, however, with respect to the precise circumstances under which such clauses operate in this way. There is, nevertheless, a line of cases which indicates that the types of termination clauses contained in the unexecuted agreement in this case do not operate to take the contract out of the statute of frauds.

The New York rule was expressed by the New York Court of Appeals in *Blake v. Voigt*, 134 N.Y. 69, 31 N.E. 256 (1892). In that case, the oral agreement required the plaintiff to obtain consignments of goods to the defendants for a year and required the defendants to pay plaintiff commissions therefore, but permitted either party to terminate the agreement seven months after its commencement. The court observed that the contract thus "could be performed in either of two ways." 134 N.Y. at 72, 31 N.E. 256. It could be performed continuously for one year, or for seven months, by exercising the option. Exercising the early termination option "did not *defeat* the contract, but simply advanced the period of fulfillment." *Id.* (Emphasis added.)

In *Radio Corp. of America v. Cable Radio Tube Corp.*, 66 F.2d 778 (2d Cir. 1933), the Second Circuit observed that in *Blake* the option to terminate was an "absolute option" which could be exercised at the "mere wish" of either party. 66 F.2d at 784. In contrast, contingencies such as bankruptcy, insolvency, or appointment of a receiver were ones over which the defendant "had no control." *Id.* Therefore, the court held:

> The existence of such an option does not take the case out of the statute of frauds for the contingency upon which its exercise depends is one over which the [defendant] cannot hasten or retard.

66 F.2d at 784–85.

These criteria for an option taking an agreement out of the statute of frauds, that it be in the control of the party as expressed in *Radio Corp. of America* and that it not defeat the contract as expressed in *Blake*, have been applied in subsequent cases. The court in *Urvant v. Imco Poultry, Inc.*, 325 F.Supp. 677, 685–86 (E.D.N.Y.1970), *aff'd*, 440 F.2d 1355 (2d Cir.1971), noted that courts have been "insistent" that, with respect to termination clauses, the statute of frauds will apply only where nothing in the contract "contemplates its fulfillment within a year and no term or event *controlled by the parties* will bring the contract to an end with its promises discharged." (Emphasis added.) *See also Schwerin Air Conditioning Corp. v. Servel, Inc.*, 132 N.Y.S.2d 372, 373 (Sup.Ct.N.Y. Co.1953) (statute of frauds applied where the termination contingency of bankruptcy "defeat[ed] the contract and does not mere-

---

**9.** Par. 7(a) of the Agreement.

**10.** Par. 7(b) of the Agreement.

**11.** 3 S. Williston, A Treatise on the Law of Contracts secs. 498–498B (3d ed. 1960).

ly advance the period of fulfillment"); *One Television, Inc. v. One Fifth Ave. Operating Corp.*, 206 Misc. 1090, 1093, 139 N.Y. S.2d 430, 432–33 (Sup.Ct.N.Y.Co.1954), *aff'd*, 1 A.D.2d 819, 150 N.Y.S.2d 153 (A.D. 1st Dep't.1956) (statute of frauds applied where the contingency is "not wholly within the control of the party having the option"); *Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co.*, 238 F.Supp. 283, 288 (E.D.N.Y.1965) (statute of frauds applied where the contingency was not dependent on the will of the parties and defeated the contract rather than provided for an alternative performance).

In *North Shore Bottling Co., Inc. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968), the New York Court of Appeals held the statute of frauds inapplicable to an agreement that:

> "included an event"—*within the defendant's control*, i.e., its decision to cease selling beer in the New York area—"that [would] end the contractual relationship of the parties," and by that token, the defendant's possible liability "within a year".

22 N.Y.2d at 178, 292 N.Y.S.2d at 91, 239 N.E.2d at 193 (emphasis added). Elsewhere in the opinion the court noted that the contingency giving rise to termination was "unquestionably within the defendant's power to take at any time." 22 N.Y.2d at 176, 292 N.Y.S.2d at 90, 239 N.E.2d at 191.

■ Unlike the options in *Blake* and *North Shore*, the contingencies giving rise to the option to terminate in the purported agreement between Jillcy and HBO are not ones over which the defendant has "absolute control." Rather, they are exactly the same as those in *Radio Corp. of America* over which the defendant has no control. Furthermore, the agreement does not establish anything like a continuous course of business between two parties which simply can be ended early as in *Blake* and *North Shore*. Its purpose is the production of a m documentary to be aired on television. e contingencies giving rise to termina-tion are those that would frustrate Jillcy in its ability to produce that documentary. They do not establish alternative methods of performance or fulfillment but, instead, clearly defeat the purpose of the contract. The termination clauses in the purported agreement between Jillcy and HBO, therefore, do not operate to render the statute of frauds inapplicable.

Jillcy alternatively argues that the writing requirement of the statute of frauds has been satisfied by the existence of the unexecuted written agreement, together with the signed memo from Louis dated January 17, 1983, directing payment to Jillcy.

■ It is settled in New York that the writing requirement of the statute of frauds may be satisfied by several writings which, taken together, may be construed as a single enforceable contract. *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953).

It is also settled, however, that if the parties intend not to be bound until a written contract is fully executed, they will not be bound until that event takes place. *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y. S.2d 841, 843, 260 N.E.2d 493 (1970); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 at 261 (2d Cir.1984); *V'soske v. Barwick*, 404 F.2d 495 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.*, 495 F.Supp. 544, 550 (S.D.N. Y.1980), *aff'd*, 697 F.2d 289 (1982).

This is true even if the parties have agreed to all the terms. *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952); *Chromalloy, supra; ABC Trading Co., Ltd. v. Westinghouse Electric Supply Co.*, 382 F.Supp. 600 (E.D.N.Y.1974).

■ The question of whether or not the parties intended to be bound is a triable issue of fact. *APS Food Systems, Inc. v. Ward Foods, Inc.*, 70 A.D.2d 483, 421 N.Y. S.2d 223 (1st Dep't 1979); *Buschman v. Diamond Shamrock Corp.*, 35 A.D.2d 926,

316 N.Y.S.2d 590 (1st Dep't.1970); *ABC Trading Co., Ltd., supra.*

In this case, HBO claims that the parties did not intend to be bound until execution of the written agreement. It points to the language in the contract that provides that Jillcy's first payment on the total contract price be paid only after execution. During negotiations, Jillcy had expressly proposed that its first payment not be dependent on execution of the agreement. This proposal, however, was not contained in the final draft agreement.

Jillcy, on the other hand, claims that the parties did intend to be bound and it points to the January 17, 1983, memo signed by HBO's Louis while the agreement remained unexecuted which directs that Jillcy be paid pursuant to a specified provision of the draft agreement. This memo is dated a day before HBO sent Jillcy execution copies of the agreement for its signature.

■ As the cases indicate, the question of intent is central to determining whether the parties are bound by the unexecuted agreement. *Reprosystem, B.V., supra.* The evidence presented to the court indicates that there is a dispute concerning intent. The resolution of that issue would therefore be improper on a motion for summary judgment. *Buschman, supra; ABC Trading Co., supra.*

Jillcy's second claim is breach of the July 21, 1982 letter agreement to "negotiate exclusively in good faith with respect to the terms and provisions relating to the distribution, exhibition or other exploitation of the Documentary." HBO has moved to dismiss this claim on the ground that such a claim is unenforceable. There has been conflict within this district concerning the enforceability of such a clause under New York law.

Jillcy cites *Thompson v. Liquichimica of America, Inc.,* 481 F.Supp. 365 (S.D.N.Y. 1979). In that case the court held that an agreement "to use best efforts to reach an agreement" constituted an enforceable agreement. 481 F.Supp. at 366. *See also Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257 (S.D.N.Y.1981), *rev'd in part, aff'd in part,* 727 F.2d 257 (2d Cir.1984).

However, in *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330 (S.D.N.Y.1982) (Weinfeld, J.), the court held that a contract that provided that a defendant "will not negotiate any further contract [ ] without first negotiating in good faith with [plaintiff]" was unenforceable. In a lengthy analysis of the issue, the court observed:

> An agreement to negotiate in good faith is even more vague than an agreement to agree. An agreement to negotiate in good faith is amorphous and nebulous, since it implicates so many factors that are themselves indefinite and uncerta; that the intent of the parties can only fathomed by conjecture and surmise.

*Id.* at 1337. In *Pinnacle Books, Inc. Harlequin Enterprises, Ltd.,* 519 F.Su; 118 (S.D.N.Y.1981), the court express similar concerns when it held unenforce ble a contract providing that "if, after e. tending their best efforts, the parties a unable to reach an agreement" regardin an option to renew, one party would be fr to offer rights to nonparties. The cou expressly disapproved of the holding *Thompson* and observed that:

> Unless the parties delineate in the cc tract objective standards by which the efforts are to be measured, the very n; ture of contract negotiations renders impossible to determine whether the pa. ties have used their "best" efforts.

*Id.* at 122. The provision was held to be "unenforceable due to the indefiniteness o: its terms." *Id.*

The most recent pronouncement by New York courts indicates that the position of the courts in *Candid* and *Pinnacle* is the proper interpretation of New York law. In *Mocca Lounge, Inc. v. Misak,* 94 A.D.2d 761, 462 N.Y.S.2d 704 (2d Dep't 1983), th' court held that courts can enforce a defi nite and certain duty to negotiate in good faith, but:

> even when called upon to construe a clause in a contract expressly providing that a party is to apply his best efforts, a

clear set of guidelines against which to measure a party's best efforts is essential to the enforcement of such a clause. 94 A.D.2d at 763, 462 N.Y.S.2d at 706. The court cited both *Candid* and *Pinnacle* with approval.

The Second Circuit briefly addressed the issue in an opinion that was issued after argument on this motion. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984). The court stated that under some circumstances an implied duty to negotiate in good faith may bind a party to a contract, but it held that "whatever implied agreement that existed here was *too indefinite to be enforced* under New York law." Slip op. at 7564 (emphasis added). The requirement of definite terms, therefore, is consistent with the position of the courts in *Mocca Lounge, Candid* and *Pinnacle.*

■ Because no definite, objective criteria or standards against which HBO's conduct can be measured were provided in the July 21, 1982 letter agreement, the provision is unenforceable on the grounds of uncertainty and vagueness and should be dismissed.