PRECISION TESTING LABORATORIES, LTD., a New York corporation, Asher Hiesiger, d/b/a Precision Testing Laboratories, Asher Hiesiger, and Arthur Ellis, Plaintiffs,

v.

KENYON CORPORATION OF AMERICA, a Colorado corporation, and Lawrence B. Kenyon, Defendants.

No. 84 Civ. 5424 (IBC).

United States District Court, S.D. New York.

Aug. 26, 1986.

Scheffler, Karlinsky & Stein, New York City, for plaintiffs; Martin E. Karlinsky, of counsel.

O'Donnell, Fox, Gartner & Sobolewski, New York City, for defendants; Stuart F. Gartner, Kenneth A. Bloom, of counsel.

IRVING BEN COOPER, District Judge.

Plaintiffs, two individuals and a corporation engaged in the business of developing emissions systems for foreign automobiles, bring this action pursuant to 28 U.S.C. § 1332 for damages based on breach of an alleged joint venture agreement. They name as defendants an individual and a corporation wholly owned by him engaged in the same business. The case was tried to the Court on February 10 to February 14 and was bifurcated (the issue of liability to be determined first, damages reserved pending our decision thereon). At the conclusion of the trial decision was reserved. Post trial memoranda were filed on April 8, 1986.

## FACTS

Plaintiffs Hiesiger and Ellis and defendant Kenyon are all involved in the "gray market" automobile business. Through the "gray market" luxury imported automobiles may be purchased by consumers at prices substantially below retail prices offered by dealers of the manufacturers.

Standards for vehicle pollution emissions are less stringent in Europe than they are here; (Tr. 27–38)[1] safety standards with respect to bumpers, door beams, headlights and door locks are different. (Tr. 36–37) Consequently, European manufacturers who export automobiles to the United States modify the cars in Europe with U.S. regulations. These modified automobiles are much more expensive than their European counterparts.

An alternative means of selling luxury foreign automobiles is to import the vehicles before they have been conformed to U.S. standards and then have them converted in the U.S. to satisfy Department of

---

1. Throughout this opinion, the letters "Tr." followed by a number in parentheses indicate a specific page in the trial transcript. The same applies to "Ex." which refers to a particular exhibit.

Transportation ("DOT") and Environmental Protection Agency ("EPA") regulations. It was discovered that through this latter method, the automobiles could be manufactured at much lower prices than automobiles that are converted in Europe and sold by dealers in this country. The process of importing these European vehicles, converting them in the U.S., and selling them here is what is known as the "gray market." (Tr. 13–14)

There are two procedures for bringing a foreign automobile into compliance with U.S. standards. The first involves modification of one particular vehicle. The process works as follows: The nonconforming vehicle is purchased in Europe and transported to the U.S. At the U.S. Customs Port of Entry, the importer of record declares that the vehicle will be brought into compliance with safety and emissions regulations within 120 days and fills out various forms. The vehicle is then released to the importer of record who brings it to a compliance center where safety and emissions modifications are performed. The next stop of the automobile is the emissions test laboratory; the results of the tests determine whether the vehicle returns to the compliance center for more work, or whether it can be made available for use or sale. The automobiles must pass a 50,000 mile standard. (Tr. 56)

At the same time as the automobile is following that path, massive paperwork is being processed by both the DOT and the EPA. Both of these organizations must review all the forms submitted to them, and the EPA further reviews the results obtained by the emissions test laboratory. The DOT and EPA then each reject the automobile for failing to meet their requirements or approve it; in the case of the latter, a release letter is sent to Customs which issues a notice of duty liquidation and admits the vehicle into commerce in the U.S. (Ex. 3; Tr. 25–35, 38–58) The average time period from when the vehicle is first purchased in Europe until it is admitted into commerce is six months. (Tr. 48–49)

The second method for bringing European automobiles into compliance with U.S. standards is called the Small Volume Manufacturers Certification Program. (Tr. 55) It was designed to benefit smaller European manufacturers who export less than 10,000 cars per year to the U.S. by lessening the onerous requirements for testing. Pursuant to the program, a manufacturer who imports less than 10,000 vehicles of one type per year for sale in this country and who agrees to abide by federal regulations and to pay certain taxes (Tr. 131) could have a prototype automobile tested by a 4,000 mile standard instead of a 50,000 mile standard. The emissions laboratory projects the emission levels of the car at 50,000 miles based on the emission levels at 4,000 miles. (Tr. 56–57) If the manufacturer has been designated a member of the Small Volume Manufacturers Program and if the prototype vehicle passes the 4,000 mile test, the manufacturer is empowered to modify nonconforming vehicles without the necessity of any further emissions tests; each individual vehicle need not be separately tested for emission levels. (Tr. 59) If the vehicle passes, the small volume manufacturer is granted a license to place his system on all similar nonconforming cars. (Tr. 133) In short, this method of conforming automobiles is much more efficient and economical.

Plaintiff Hiesiger is a New York attorney who has been working as a real estate investor since the 1950's. (Tr. 10–11) In 1982, he turned some of his efforts toward the business of importing foreign automobiles through the gray market. (Tr. 12) Early that year he invested $50,000 in purchasing five Porsche automobiles which were each individually modified and sold. (Tr. 15) In late 1982 and early 1983 he considered getting involved in a project to import the Volkswagen Beetle from Mexico. In connection with those plans, a prototype vehicle was brought to New York and arrangements were made for Hiesiger to meet the person in charge of the certification program, defendant Kenyon. (Tr. 67–68)

Kenyon, once a motor vehicle mechanic, formed defendant Kenyon Corporation of America ("KCA") sometime in 1981–82 (exact date unspecified) in order to conduct engineering and compliance work on European vehicles imported into the U.S. (Tr. 749) Beginning in 1982, Kenyon worked with an engineer named Claus Liphardt on developing an emissions control system that would replicate the work done by European manufacturers who import cars to this country. (Tr. 750–51) Although by March 1983 Kenyon had certified five vehicles through the one time pass procedure, KCA had not certified a vehicle pursuant to the Small Volume Manufacturers Program (Tr. 755); however, the company's application to be a member of that program had been granted in the spring of 1983. (Tr. 760)

The relationship between Kenyon and Liphardt is noteworthy. According to the deposition testimony of Liphardt, when he first met Kenyon the defendant was unsuccessfully using a very basic, undeveloped system in attempting to pass a certificate car. (Ex. 131 at 19–20) After reviewing Kenyon's problems, Liphardt designed a new and meritorious system which he shared with Kenyon. (Ex. 131 at 21–22) It is clear that Liphardt, not Kenyon, was solely responsible for that system and its engineering. (Ex. 131 at 23–24)

The first meeting between Hiesiger and Kenyon took place in March, April or May of 1983. (Tr. 70, 754) At that time Kenyon was performing engineering work for one Albert Mardikian pursuant to a Small Volume Manufacturers Certificate program. (Tr. 70–72, 757) Kenyon represented to Hiesiger that he and his engineer Liphardt had the capability to perform all work required for certification. (Tr. 72) Soon thereafter, Hiesiger ceased his involvement in the Volkswagen Beetle project. (Tr. 76)

The next meeting between Hiesiger and Kenyon, which occurred one to two months after the first, took place at Hiesiger's apartment at 31 West 11th Street in Manhattan. At trial, each party recalled different aspects of their conversation at that time. Kenyon remembered that Hiesiger stated he did not want to purchase KCA, though at an earlier time he had expressed such an interest, because the asking price of $30,000 was too high. (Tr. 759–60) He also recollected a general discussion pertaining to the "Bosch-Lambda" components (Tr. 761), an emissions technology which gives the engine in a car a great amount of power, low amount of emissions, and high mileage. (Tr. 116–17)

Hiesiger's memory of the meeting focused on the suggestion by Kenyon of a partnership between Hiesiger, Kenyon, Liphardt and Jerry Ellison, the chief laboratory technician of the Mardikian organization. (Tr. 85) Hiesiger had responded that he "would be very glad to see such an organization and would make every effort to bring Ellison on board if [Kenyon] would make an effort to bring Claus [Liphardt] on board." (Tr. 86)

Liphardt was not interested in getting involved in the suggested arrangement (Tr. 98), so, according to Hiesiger, Kenyon then suggested that he, Hiesiger and Ellison proceed to modify systems for three Porsche automobiles. Heisiger offered to pay for the vehicles, hire out work space in Amagansett, Long Island, pay for necessary parts, provide a testing facility in Pennsylvania, and pay for a $7,500 bond needed to import the vehicles (Tr. 99–100) All in all, in June or July 1983 (Tr. 106), Hiesiger paid $100,000 in purchasing the three Porsches in Kenyon's name. (Tr. 103–04) Of that money, $4,000 was paid directly to Kenyon to reimburse him for a deposit he had made on one of the automobiles. (Tr. 102) An additional $40,000–50,000 was expended between July and September 1983 (Tr. 106) to pay for technicians and for insurance and testing costs. (Tr. 106) Hiesiger testified that Kenyon came to the Long Island facility three or four times in August 1983 to work on the cars together with Ellison and several others. (Tr. 108) The vehicles were not successfully brought into conformity and the project was abandoned in September 1983. (Tr. 110)

Kenyon's memory of the events surrounding the Porsche episode diverges. According to Kenyon, in July 1983, three Porsches were ordered which were to be sold to Hiesiger. (Tr. 764–66) Although Kenyon did not perform any conversion work on those vehicles, Hiesiger paid him $5,000 for safety parts and for some technical consulting work with Ellison. (Tr. 767) Their dealings with respect to the Porsches, Kenyon testified, terminated in August 1983. (Tr. 768)

In September 1983 plaintiff Precision Testing Laboratories, Ltd. ("PTL") was incorporated with Hiesiger as the sole shareholder for the purpose of doing research and development in emissions systems, manufacturing conversion kits, and buying and selling foreign automobiles in need of compliance. (Tr. 323, 335–56; Ex. E) It was Hiesiger's testimony that in the same month PTL was formed, he and Kenyon again met. (Tr. 112) He stated that Kenyon then informed him that he had come into the possession of a vehicle built by Liphardt which had only failed a small part of the EPA test, and he had learned the secrets of the technology. (Tr. 124) At the conclusion of that meeting, Hiesiger agreed to and did arrange laboratory time at no cost to Kenyon (or to Hiesiger, who was allowed free time from the owner in consideration for past work performed by Hiesiger for the owner) (Tr. 135–36) to conform a Mercedes-Benz 500 series automobile purchased by Kenyon's mother. It is undisputed that Hiesiger also provided to Kenyon from September 1983 to July 13, 1984 the use of one of the 400 apartments he owned, located at 218 West 10th Street in Manhattan, rent free. (Tr. 120, 768) Hiesiger had used the apartment to house people associated with his various businesses. (Tr. 121) Hiesiger maintains that he could have received $600 per month to rent the apartment (Tr. 123); Kenyon testified that Hiesiger did not ask him to pay rent (Tr. 769), that he wanted a lease but Hiesiger would not provide one (Tr. 796–97), that he only lived there half of the time (Tr. 772), and that he paid rent on a second apartment in Gladstone, New Jersey where he resided the other half of the time. (Tr. 770–72; Ex. R, S)

According to Hiesiger, Kenyon's efforts on the Mercedes-Benz 500 did not meet with success; Kenyon reported that although he was achieving good results, they were insufficient to bring the car to certification level. (Tr. 134) It was at this time that plaintiff Ellis entered the picture.

Of the three individual parties involved in this lawsuit, we were most impressed with the testimony and demeanor of Ellis. We find him to be an honest, upright man, successful in his field, who was trying to work out an arrangement mutually beneficial to everyone concerned. Although he suffered a lapse of memory with respect to several significant items, on balance we credit his testimony as the most credible of the three.

Ellis is a 51 year old man who owns and operates Texas Coach Company (and three interrelated firms) in Houston, Texas where he converts foreign automobiles to U.S. standards and does research and development for nonconforming European automobiles. (Tr. 535–36) Before meeting either Hiesiger or Kenyon, Ellis had successfully created emission control systems for 25 cars using the individual modification and testing procedure. (Tr. 551) He had also produced two vehicles which were accepted as prototypes for the Small Volume Certification Program. (Tr. 556)

Hiesiger and Ellis first became acquainted in August 1983 when Hiesiger travelled to Texas Coach Co. in Houston to meet Ellis. (Tr. 114, 558) Hiesiger was impressed with the size and scope of the factory. (Tr. 114) In the course of their discussions during that visit, Hiesiger expressed considerable interest in the Small Volume Certification Program. (Tr. 115, 558) He was aware of the proliferation of cars being imported through the "gray market" and wanted to sublicense for a profit a certificate of conformity, if he could obtain one, to those whose cars needed to be passed. (Tr. 125) In the autumn of 1983, only a company called Village Im-

ports had obtained such a certificate of conformity; they had accomplished it by the efforts of Arthur Ellis. (Tr. 129)

Sometime between September and November 1983, Hiesiger sent Ellis one of the three Porsches he had earlier imported in connection with his arrangement with Kenyon. Ellis certified the car pursuant to the one time pass option (not through a certificate of conformity) (Tr. 116, 559), for which Hiesiger paid Ellis $5,500. (Tr. 362, 559)

Thus, by the fall of 1983, Hiesiger was involved in one working relationship with Kenyon and in a separate working relationship with Ellis. Coincidentally, Ellis and Kenyon met each other for the first time at a Washington, D.C. EPA conference in November 1983 relating to "gray market" importing of foreign automobiles (Tr. 561, 774) where Ellis appeared as a representative for PTL. (Tr. 330-31) They sat in the same row on the airplane following the conference and discussed their respective involvement in the compliance industry. (Tr. 562)

During this time period, the professional relationship between Hiesiger and Ellis continued to develop. This was evidenced by Hiesiger's payment to Ellis of $10,000 for research in connection with compliance work. (Tr. 363) Kenyon, who was not then involved in any of the Hiesiger-Ellis affairs, was never advised of this transaction. (Tr. 364)

In the end of December 1983, a meeting was held at Hiesiger's apartment attended by all three parties.[2] (Tr. 139, 562, 777) After some preliminary discussions, they agreed to meet the next day. The testimony of Ellis and of Kenyon as to what took place at that second meeting support each other. Ellis stated:

> Mr. Kenyon came and brought a satchel or bag of ... [e]mission control parts ... and started discussing what he had done.
>
> He also said that he had his company listed as a [small volume] manufacturer but that he had not been able to produce

a certificate, and that further he didn't know if he could, and that further that even if he did he didn't know if he could administer it.

> I listened to him and began to make a decision as to whether I would work with him. I told him that—and Mr. Hiesiger—that my decision was that we would look further into it, that we would examine it closer. I invited him to come to Texas and bring the parts so that we could put them on the car, one of my cars, and do some preliminary testing, whereupon he agreed, and we decided that we would continue further on this study in Houston, Texas.

(Tr. 564)

Kenyon testified that:

> I described the parts, I told them how they worked, and we talked generally about technology .... Mr. Ellis told me that he, too, was working on a 500 Mercedes, but not with these components, and he would be very interested to see how these components work.... He invited me down to Texas to show him the parts on a vehicle and demonstrate to him that, in fact, they would work.

(Tr. 779)

Kenyon further testified as to the detailed information he and Ellis exchanged that day. (Tr. 780-82)

Kenyon did not remember any verbal contribution by Hiesiger (Tr. 783); Ellis recalled that Hiesiger "encouraged [them] generally." (Tr. 566) Hiesiger remembered Kenyon's production of the bag of components (Tr. 141); a technical discussion between Ellis and Kenyon (Tr. 142); and an agreement for Kenyon to travel to Texas so as to enable Ellis to test Kenyon's components. (Tr. 144-45) Hiesiger further testified that the following discussion took place:

> [Kenyon] said, "You know, looking at [Hiesiger] at this point, I wouldn't know what to do with a certificate of conformi-

---

**2.** Mrs. Ellis and Mrs. Hiesiger were also present in the apartment, though not as participants in the discussions.

ty if I had it. I need you fellows. You have business experience and expertise. Art [Ellis] has the technical expertise. I am essentially a promoter, a salesman. If you guys put this together, I will sell the hell out of this thing. I will sell kits all over the United States. The three of us together make one hell of a team. Let's do this together."

[Hiesiger] said to Larry, "I agree with you, I think that this makes even a better team than the one we thought about earlier of Jerry Ellison and you and me and Claus. Art has proven that he can get certificates. He has done it before. As for being a salesman, you are the worlds best salesman. . . .

As for me, I do think I have some organizational business experience. I have an office, I have staff, we have people, we can lend our efforts, we can lend what money we can make available to it. I think this thing will work."

(Tr. 142–44)

We find it significant in the extreme that such a vital claimed conversation, going to the very heart of the formation of an alleged joint venture, was remembered by Hiesiger only. Not even the co-plaintiff, Ellis, expressed a memory of any such discussion. We find that although there might have been some allusion as to the three of them working together, no agreement was ever approached. To the contrary, the upshot of the meeting was that Ellis and Kenyon would get together without Hiesiger to exchange mutual information.

Hiesiger testified that on January 5, 1984, the parties met again; there is no indication of the outcome of that meeting. On the same date Hiesiger paid Ellis $20,-000 to develop a system on a Mercedes-Benz 280 automobile. Once again, Kenyon was never advised of this transaction. (Tr. 364)

In mid-January 1984, Kenyon travelled to Houston with his components. (Tr. 567, 784) After installing them into a vehicle, it was brought to Automotive Research Testing Laboratory ("ARTL") for tests. (Tr. 570, 785) The results were satisfactory, and Kenyon and Ellis decided to go forward with further experiments on the new system. (Tr. 571) Before leaving Texas the next day, Kenyon and Ellis had a discussion relating to their future relationship. At trial, both testified that they had at that time expressed their joint desire to work together and to sell or convey 50 percent of the stock of KCA to Ellis. (Tr. 577, 787) Kenyon testified that he had insisted their agreement be subject to clearing by his attorneys and to a further meeting. He also stated that Hiesiger, as a friend, should be allowed to use any certificate obtained for an unspecified number of vehicles. (Tr. 787) Ellis, on the other hand, testified that Kenyon had not been interested in discussing the participation of Hiesiger. (Tr. 577)

After Kenyon returned to New York, Ellis continued experimenting with the system Kenyon had brought. There were a number of problems therein, many of which Ellis was able to rectify. (Tr. 578–79) For instance, one of the important components employed to regulate emissions is called a "catalytic converter." Although Kenyon had originally used a DeLorean converter, Ellis discovered a German one called the 317 Zeuna Starker which the parties used on the car that later passed certification. (Tr. 579–81) Another example concerns the air pump, a device that pumps air into the exhaust system, thereby diluting and burning away emissions. (Tr. 582–83) An air pump, however, is expensive and its mounting and proper operation are hard to insure. Consequently, before ever meeting Kenyon, Ellis had developed emission control systems that did not use an air pump; he discussed with Kenyon applying that technology to Kenyon's system. (Tr. 584) Indeed, the certification car did not have an air pump. A third series of discussions focused on a part called the "fuel block" which accumulates fuel. Although Kenyon was able to explain to Ellis the function of this component in a general way only, Ellis' research revealed its true inner workings. (Tr. 585–86) The fourth

significant part which the two discussed was the "fuel pressure regulator" the re-engineering of which Ellis believed was the key to developing a successful car without an air pump. Ellis agreed to spend whatever time was necessary in developing the regulator, encouraged by words from Kenyon such as, "I know you can do it." Eventually, Ellis did re-engineer the fuel pressure regulator. (Tr. 587–88)

Sometime between the middle and end of January 1984, Hiesiger went to Houston to visit Ellis and to observe the progress being made as Ellis developed Kenyon's system. Ellis told Hiesiger that he needed financial help (Tr. 589–91); around January 20th, Hiesiger placed $100,000 on deposit in a bank account in the name of Ellis Compliance Corporation to enable Ellis to develop a certificate system using the Kenyon technology. (Tr. 146–47) This transaction was never reported to Kenyon. (Tr. 591) Hiesiger testified that the $100,000 that was advanced was in connection with the parties' project (which the three had never formally defined) but was not an obligation of the project. (Tr. 346–47)

On January 21, 1984, Ellis signed a letter agreement prepared by Hiesiger. (Ex. D) The letter stated:

January 21, 1984

Dear Asher—

This is to confirm our understanding concerning dealings beginning in August 1983 to date.

You have paid to me $135,500 in furtherance of certain research projects dealing with the development of emissions control systems for various automobiles, including Porsche 930 Turbo, Mercedes 500 and others. Of this amount $5500 was paid for a system develped for a 930 Turbo delivered to you. The balance of $130,000 remains open. Until such time as proper value has been received for these sums paid, and additional agreements to be prepared by your tax counsel are signed by us, I pledge the following assets:

(1) The receivables of Texas Coach Company

(2) The parts inventory of Elco Parts Company

(3) The stock of Ellis Enterprises Int'l, Inc.

(4) My anticipated ½ interest in Kenyon Corporation

(5) My personal guarantee.

Sincerely,

Arthur L. Ellis
[signed]

Witness:

Catherine Hiesiger [wife of Asher Hiesiger]
[signed]

Accepted and Agreed to:

Asher Hiesiger
[signed]

Neither Hiesiger nor Ellis ever informed Kenyon that Ellis had pledged to Hiesiger the stock of Ellis Enterprises International or his potential one half interest in KCA. (Tr. 382)

During Hiesiger's visit in Houston, he and Ellis discussed the possibility of getting together with Kenyon in a joint effort to modify foreign automobiles with this new, developing technology. Ellis told Hiesiger that Kenyon had indicated a preference to work with Ellis alone, but Ellis assured Hiesiger that he would protect him and give Hiesiger half of his participation. (Tr. 156, 592) Upon returning to New York, Hiesiger called Kenyon; Hiesiger testified that Kenyon denied any statement that he was working behind Hiesiger's back. (Tr. 159) Kenyon, on the other hand, testified that in their telephone conversation,

Mr. Hiesiger said that I was not grateful. He said that he was my Dutch uncle, or I was his Dutch uncle. He said how dare I not include him in any discussion with Mr. Ellis. He said that he owned me. He said he provided me a place to live. He asked me what he was supposed to get out of anything that happened between Mr. Ellis and myself.

I told him that he would get the use of the certificate for 15 to 25 cars. He told me that that was not enough and that he wanted to be part of anything that hap-

pened between Ellis and myself. I told him that it wasn't anything personal. I told him that I just didn't feel that he should be involved in this, that I provided much of the technology in the car and that we were basically going to be working together on the technology.

(Tr. 801)

On February 16, 1984, Hiesiger, Ellis and Kenyon had another meeting in Hiesiger's Manhattan apartment. The parties discussed Kenyon's dissatisfaction with including Hiesiger in any deal between Ellis and Kenyon. (Tr. 161, 792) Kenyon's expressed inclination seemed to have been rooted in the fear of losing his business to Hiesiger and Ellis. KCA, unlike any of the companies owned by Hiesiger or Ellis, had been designated a small volume manufacturer after almost a year of effort to obtain that status. (Tr. 164) Consequently, if the parties were to certify cars through that program, they would have had to operate through KCA. Kenyon testified that Hiesiger suggested each of them become a 33 percent owner of KCA. (Tr. 791) Kenyon remembered nothing further about the meeting. According to Hiesigerk, when Kenyon expressed that he was upset, stating that both Hiesiger and Ellis had independent businesses the shares of which were not being offered to Kenyon, Hiesiger and Ellis reassured him, suggesting that they would set him up in a business of importing and certifying the Gelaendewagen, a four-wheel jeep-type vehicle (Tr. 161–62); that they would buy excess inventory from Kenyon at a profit; that they would sell for Kenyon an automobile he owned that he had been unable to sell; and that they would pay him a consulting fee in connection with services to their firms. (Tr. 162) Hiesiger further testified that the parties did not discuss any shareholder arrangements at that meeting. (Tr. 397)

It was Ellis' testimony that the parties talked about paying the outstanding debts of KCA; that Ellis' parts company, Elco Parts Company, would supply conversion kits; and that the stock of KCA would be split such that Kenyon would own 50 per-

cent and Hiesiger and Ellis would each own 25 percent. (Tr. 598–99) The parties decided to "sleep" on the matters discussed and to meet again the next day. (Tr. 163)

The all-important meeting was held on February 17, 1984, again at Hiesiger's New York City apartment. It is plaintiffs' contention that agreements previously made and acted upon were solidified at that time; defendants maintain that the discussions were not final and were subject to review by Kenyon's attorney, Kenneth A. Bloom, Esq.

We shall examine the evidence on each of the items taken up at the meeting on February 17, 1984. The first issue was the sale of KCA stock to Hiesiger and Ellis. Kenyon testified that he said, "if some sort of ... situation came about that I felt was right, ... Mr. Hiesiger could be involved." (Tr. 796) From his own notes written the night before and checked off during the meeting of the 17th, however (Ex. 19), it is clear that the discussion with respect to the sale of stock was not so limited. Kenyon's notes manifest his intent to sell Hiesiger and Ellis each 25 percent of the stock of KCA in consideration for $5,000 from each. (Ex. 19) The notes are corroborated by Ellis' testimony that "Mr. Kenyon ... decided that he would sell us for a token fee, each of us, the 25 percent of the stock for $5,000 each," (Tr. 601) and by Hiesiger's testimony that Kenyon said, " 'How's about $5,000 apiece from you fellows to be paid to me, each of you for 25 percent of the stock, is that okay?' We said yes." (Tr. 166)

Whether Hiesiger and Ellis also agreed to assume the risks and liabilities of KCA is uncertain. Although Kenyon requested this (Ex. 19) and Hiesiger testified that the parties so agreed (Tr. 166,202), according to Kenyon Hiesiger said that was not "okay" (Tr. 796), and Ellis testified that the parties "talked about the liabilities that my companies had and the liabilities that Kenyon Corporation had, and decided clearly that those would be shared only by us and by us individually." (Tr. 601; Ex. N) In short,

the parties did not seem to agree on this term of their discussion.

It was Kenyon's testimony that he expressed a desire to get a lease on the apartment owned by Hiesiger in which he was living, but Hiesiger would not agree to such an arrangement since the apartment was rent controlled and an agreement had been worked out with a Mr. Joe Ciliberto to the effect that if he ever needed a place to stay, he could return to it. (Tr. 796–97) However, Hiesiger said he would look for another apartment with a lease for Kenyon. (Tr. 796–97) Hiesiger did not deny this portion of the conversation; Ellis did not testify with respect to it.

The next item discussed by the parties was the use of components from Elco Parts Company. Kenyon testified that Ellis expressed the opinion that all parts in connection with their project should come from Elco—a concept Kenyon did not like because he preferred to have KCA supply some of the parts. According to Kenyon, no agreement was reached on this issue. (Tr. 797) Ellis agreed that the parties talked about "my parts company supplying the parts." He did not say whether any agreement on that issue was reached. (Tr. 601) Hiesiger's testimony filled in the factual gap on this issue; he stated it was Ellis' suggestion that since he had a large factory and a number of employees, "it would be most economical for his parts company to do the parts work. Larry [Kenyon] finally agreed." Kenyon, however, according to Hiesiger, arranged to be a consultant to Elco for $5,000 due to his "good connections for parts." (Tr. 170) Indeed, Hiesiger's testimony is corroborated by Kenyon's notes which state, "LBK will receive $5000 parts finder fee from ELCO Parts. LBK will assist ELCO in initial procurement of M–B [Mercedes-Benz 500] 'kit' parts." (Ex. 19)

Kenyon also asserted his desire to keep the land cruiser automobile he was driving. He further said that any profits made on the test vehicle they were using to obtain certification should go to his mother who had purchased the automobile. All agreed to these proposals. (Tr. 168, 199–200, 796–98) Hiesiger further testified that Kenyon wanted to sell a Volvo his mother had paid for and was driving which was registered in the name of KCA and use the money to buy a Mercedes which they would then convert. (Tr. 168) Once again, Hiesiger's memory was confirmed in the notes written by Kenyon which stated, "The Volvo Turbo (which in fact belongs to Eileen Linda Bruskin [Kenyon's mother]) will be taken on trade (and sold) against a new vehicle of Bruskin's choice to be sold to her at cost." (Ex. 19)

Ellis and Hiesiger both testified that Vicki Cheikes, Esq., who acted as counsel for Hiesiger on several projects, was present at part of the meeting to discuss a gas guzzler tax. (Tr. 165–66, 193–94, 601; Ex. N) Ellis also stated that he told the other two he would rely on them in organizing the details of their company. (Tr. 601–02)

Hiesiger testified that the parties discussed several additional points. One was the purchase by Texas Coach of inventory Kenyon had bought before Ellis' factory took over the compliance work at a price of cost plus 15 percent. Kenyon's notes also reflect this feature (Ex. 19), which apparently was agreed to. Another item discussed (seemingly without resolution) was Kenyon's keeping $40,000–50,000 in profits to reimburse him for loans he had made to the corporation. (Tr. 168) The breakdown of costs was detailed in Kenyon's notes. (Ex. 19) A third point of discussion, according to Hiesiger, was an understanding that all parties would generate capital, and any loans made would be repaid at prevailing interest rates. (Tr. 168) There was no corroborating evidence of this point. A fourth item, listed also in Kenyon's notes, was Kenyon's agreement to repay Hiesiger for the $7,500 bond he had put up when the three initial Porsches were imported. (Tr. 172; Ex. 19) A fifth item mentioned by Hiesiger was his promise to help Kenyon finance the Gelaendewagen project suggested the previous day and set up corporate headquarters in Colorado. (Tr. 172;

Ex. N) Kenyon's notes on that topic state: "Asher Hiesiger agrees to arrange financing in LBK's M–B Gaendewagen [sic].... The Main office will be in Colorado—LBK will be responsible—expense account for that office—All certification [unreadable] issue will go through that office." (Ex. 19; *see also* Tr. 605) The next topic the parties addressed was the "coast down" procedure, an essential test which had to be performed on a test car before submitting the package to the EPA for certification. The decision for Ellis to perform this test on a car other than the "mule" car they were otherwise using was apparently unopposed. (Tr. 198–99; Ex. 19) A seventh item concerned a man named Chuck Jencks who Kenyon had worked with on the Porsches. Kenyon requested that Jencks be compensated in some way, and the other two agreed. (Tr. 200; Ex. 19)

A final and significant item that all agree was discussed concerned solidifying the various terms that had been the subject of their meeting in a formal written document. Kenyon testified that he said he would have to discuss everything with his attorney, to which Hiesiger responded "that that was fine with him and he wanted it that way." (Tr. 796) At the conclusion of the meeting, Kenyon stated his desire to call his attorney. Ellis was opposed to getting involved in legal negotiations, but Kenyon stated, "that I had representation that Mr. Hiesiger was an attorney and I should have an attorney, and Mr. Hiesiger agreed." (Tr. 798)

Hiesiger had a different impression of the role of Kenyon's attorney. He testified that "We agreed that what we had agreed upon at that meeting would be translated into a more formal document by Mr. Bloom who represented Mr. Kenyon." (Tr. 181)

At the conclusion of the February 17th meeting, Kenyon called Mr. Bloom; Kenyon did not testify as to the contents of their conversation. However, it was Hiesiger's testimony that Kenyon revealed to

Mr. Bloom that "we have straightened out the matters I have been talking with you about, we have come to certain agreements between the parties, we would like to get them down in more formal fashion as quickly as possible. We have decided to have you do this on behalf of all of us." (Tr. 190)

Following Kenyon's conversation with Bloom, Hiesiger got on the telephone with the attorney. Kenyon testified he heard Hiesiger say, "Yes, no problem, I want Larry to be happy with this." At the conclusion of the discussion between Hiesiger and Bloom, Kenyon stated that any agreement between the parties was to be in writing and subject to his attorney's review; according to Kenyon, Hiesiger agreed to this. (Tr. 799)

Hiesiger testified that he went over with Bloom the points the parties had agreed to. He said he was leaving for Europe on March 9th and that the parties desired "to put this in formal form as quickly as possible so that there would be no further possibility of misunderstanding between the parties." Hiesiger further called Bloom's attention to one possible problem he foresaw: If the stock were split 50–25–25, and if Ellis and Hiesiger adopted a position on an issue opposed to the position of Kenyon, a deadlock could result. Hiesiger suggested that one solution was an arbitration clause, but requested that Bloom's office "bend its efforts to some other method if you know it." Hiesiger testified that Bloom said he expected to have formal papers ready to be signed prior to Hiesiger's departure for Europe. (Tr. 191–92)

It was Bloom's deposition testimony he told Hiesiger "that any arrangement that was to occur between [the parties] would have to be in writing and approved by this firm." (Ex. 130 at 18) [3]

Subsequent to that telephone conversation, Kenyon gave Bloom a copy of the notes he had taken prior to and during the February 17th meeting so Bloom could be-

---

**3.** Bloom also deposed that he spoke to Ellis and gave him the same message; however, the testimony of Kenyon, Heisiger and Ellis contradict

the position that those two spoke on that occasion. We find that Bloom talked with Kenyon and Heisiger, but not with Ellis. (Ex. 130 at 13)

gin to prepare drafts of an agreement between the parties. (Ex. 130 at 20, 53)

We find that the terms reached by the parties were intended to operate as a framework in which the parties would continue to deal, but were not intended as a final, binding agreement. This conclusion finds support in the very fact that Bloom, an attorney, was called in the presence of all three parties and requested to draft agreements; had the terms discussed been considered a binding agreement, there would have been no need to consult an attorney at that time for the express purpose of drafting a formal written contract. More significantly, during the telephone conversation with Bloom, he was specifically notified by Hiesiger of at least one potential and large problem in the parties' discussed arrangement: the deadlock situation. It was thus clear to all concerned that there were outstanding issues to be resolved before there would be any finality of agreement. Finally, we note that the parties did not have the same understanding as to all of the terms discussed—for example, whether all would assume the risks and liabilities of each of their corporations. The terms of any alleged agreement not having been made clear, we find that the parties did not at the February 17th meeting intend to be bound by the terms and conditions of the points discussed.

Four days after the meeting in which, according to the position of the plaintiffs, a joint venture was solidified, Hiesiger filed a certificate of incorporation for a company called International Motors, Ltd. (Ex. E) The company was owned wholly by Hiesiger's wife, and its corporate purpose was, *inter alia,* "to own, operate, manage and to do everything normally associated with conducting the business of the import, sale, and lease of foreign cars." (*Id.*) On cross-examination, Hiesiger conceded that International Motors is a competitor of KCA. (Tr. 456–57)

Following the February 17th meeting, Ellis and Kenyon spoke over the telephone about moving the "mule" car ahead toward the testing stage. By the end of that month, the vehicle coast down test, which determines the amount of power of the automobile (Tr. 636), had been performed, paid for by Ellis. (Ex. 43) Ellis' technicians spent 93 hours preparing the car for this test. (Tr. 632) It was Kenyon's testimony that Ellis had agreed to prepare and pay for that test in exchange for examining the workings of Kenyon's system. (Tr. 836–38)

The automobile was then ready to be fully tested—a stage that was to occur at the Automotive Testing Laboratory ("ATL") center in Ohio. (Tr. 606–07) An employee of Kenyon drove the car to ATL. (Tr. 808) Commencing at the outset of March, 1984 both Ellis and Kenyon spent periods of time there working on the vehicle. Ellis testified that he was actually present for five weeks, Monday through Friday, working up to 18 hours a day (Tr. 611), and that Kenyon was there a total of about three weeks. (Tr. 612) By April 13, 1984, according to Ellis, the car achieved certification levels. (Tr. 619)

In contrast, Kenyon testified that during the period of time the test car remained at ATL, Ellis was only present for three to five weeks. (Tr. 807) The deposition testimony of David Bodey, an employee at ATL, confirms the position (which we adopt) that Ellis was at ATL more frequently than Kenyon and did most of the physical labor on the car. (Ex. 132 at 48, 56)

Kenyon maintained that during his time at ATL he assisted Ellis, applied special lubricants, rebuilt the control pressure regulator, adjusted the carbon monoxide levels, adjusted the cold start plug, analyzed traces and procured parts. (Tr. 810–11) As for his own role, Ellis testified that he installed new injectors, performed cold starts, installed the fuel pressure regulator which he had built (Tr. 609–10); made daily adjustments; changed internal configurations; and rebuilt the exhaust system. (Tr. 618) In our opinion, and we so find, the intellectual power applied and resulting in the success of the conversion of the automobile was Ellis'. Although Kenyon procured the initial components, it was Ellis who, after weeks of adjusting and readjust-

ing, put them together in a way that created a certification level vehicle. Kenyon, who had some expertise, secondary at best, assisted in the effort, but the evidence overwhelmingly convinces us that without Ellis, the automobile never would have achieved certification level.

KCA paid all of the bills sent by ATL in connection with the testing work (Ex. O, P), "because the certification effort was Kenyon Corporation's certification effort." (Tr. 500) Kenyon testified that he "told Mr. Ellis that I would pay the bills, that it was Kenyon Corporation's car, it was my money, and until there was some signed written agreement between all the parties, I didn't see any reason that Mr. Ellis should pay or Mr. Hiesiger or anybody else. It was my car." (Tr. 502)

At about the same time as the "mule" car was taken to ATL in Ohio, a meeting was held at Hiesiger's apartment (on March 1, 1984) attended by Heisiger, Kenyon and an employee of Texas Coach Company, Tom Duensing. (Tr. 209) At that time, Hiesiger wrote out a check drawn on the account of PTL to KCA in the amount of $15,055.41 for the purchase of emission parts Kenyon was selling to Texas Coach. (Tr. 211–12; Ex. 22) During the course of the March 1st meeting, Hiesiger expressed his failure to understand Bloom's delay in preparing the parties' agreement. Hiesiger testified that Kenyon told him Bloom was preparing six different documents, to which Hiesiger responded that it did not sound to him like Bloom was doing what was requested. (Tr. 215)

On March 1 or 2, 1984, Hiesiger called Bloom who informed him that the matter was beyond his ability to handle and he had referred it to a corporate partner in the law firm, Mr. Sobolewski. (Tr. 217) Hiesiger then spoke to Sobolewski who told him that he was working on the drafts and expected to have them for Hiesiger's review before the latter left for Europe. (Tr. 218)

No draft agreements were presented to any of the parties before Hiesiger's European departure on what was supposed to be a two week trip and turned into a two month trip. (Tr. 219) The stated purpose of the voyage was to find cars, parts and inspect European facilities where compliance work could be performed or to whom compliance kits could be sold. (Tr. 219) Hiesiger kept in touch with Ellis (but not Kenyon) while he was away by telephone and telex. Consequently, he knew of the progress made on the "mule" car as well as the failure of the attorneys to present a draft agreement. (Tr. 223–28) Indeed, when Ellis was at ATL with Kenyon, he asked about the draft agreement. He testified that Kenyon said there were some complications and Bloom was referring it to one of his partners. (Tr. 616–17)

In March and April, two checks were paid to the order of KCA and Lawrence Kenyon by Elco Parts Co. for the purchase of components. (Exs. 20, 21)

On April 13, 1984, the day the "mule" car achieved certification levels, Ellis called Kenyon to share the good news. Ellis recommended that Kenyon finish assembling the paperwork for EPA as soon as possible. (Tr. 636–37) The next week, the paperwork, i.e., the EPA application, was sent to Ellis. (Tr. 638; Ex. 42) At the end of the month, Kenyon went to ATL and performed some additional work on the "mule" car; he testified that it took him two weeks to complete the requisite jobs. (Tr. 813–15) Ellis agreed that the additional work was necessary for EPA documentation. (Tr. 710)

Around the end of April or beginning of May, Kenyon travelled to Houston and met with Ellis. In accordance with the parties' February 17 discussions, Ellis had sold the Porsche Kenyon had not been able to sell, and he paid Kenyon the proceeds at that time. (Tr. 642) During their meeting, Kenyon expressed his dissatisfaction with the partnership arrangement and again indicated his discomfort with Hiesiger. Ellis responded by saying, "we agreed 50–50. You can forget Mr. Hiesiger, let's continue on with our original agreement of 50–50, and Mr. Hiesiger is out. I'll take care of him myself." (Tr. 643)

Hiesiger returned from Europe on May 8, 1984. On May 10th, he met with Ellis in

Houston. The two telephoned Kenyon. Hiesiger testified that Kenyon said he was being pressured for payment of a Gelaendewagen, but Hiesiger assured him he had taken care of the matter with the sales manager in Germany. (Tr. 230–31) Hiesiger then asked about the preparation of the draft agreements, to which Kenyon replied that he would check into their status. Kenyon later called back, saying he had spoken with his attorneys and there would be a meeting at their office on May 18, 1984. (Tr. 231)

In his testimony, Ellis reiterated the sum and substance of Hiesiger's statements, but added that Hiesiger spoke to Kenyon in "strong and loud and forceful tones." (Tr. 650) When Ellis thereafter spoke to Kenyon, Kenyon said, " 'I don't have to take this kind of talk. I just don't have to take this kind of treatment.' " (Tr. 650) Ellis tried to reassure him and said, "we should get this matter straightened up as soon as possible." (Tr. 650)

On May 18, 1984, a meeting was held at the law firm of O'Donnell, Fox, Gartner & Sobolewski at 820 Second Avenue in Manhattan and attended by Hiesiger, Ellis, Kenyon, Bloom, Sobolewski, Vicki Cheikes, Esq., and Mrs. Ellis. (Tr. 233, 651, 817; Ex. 129 at 18, 130 at 42) At the outset of the meeting, Sobolewski handed out an agenda listing seven topics: financing: "(a) need $175,000, (b) loans on books—LBK to be repaid"; ownership: "LK–51%, AH–24½%, AE–24½%"; directors: "(5)—LK, AE, AH plus 2 to be elected by LK"; compensation for Kenyon: "salary plus percentage of gross revenue"; parts assembly and distribution; restriction on transfer of stock; and Kenyon as sole person to sign off on cars. (Ex. 23) Hiesiger told Sobolewski that this did not represent what the parties had agreed to in February. (Tr. 235) In strong and angry tones that Sobolewski characterized as a "tirade" (Ex. 129 at 18) and Bloom as a "tantrum" (Ex. 130 at 43) Hiesiger dissented to the idea of the stock being split 51–24½–24½ instead of 50–25–25 as had earlier been agreed and at giving Kenyon $175,000 in financing instead of $5,000 from Hiesiger and $5,000 from Ellis

plus the sale of certain assets. (Tr. 236, 818–19)

Hiesiger testified that those present discussed Kenyon getting $60,000 from the sale of the Porsche and from the sale of KCA inventory. It appears that the question of additional financing was left open. (Tr. 246, 706) With respect to the sale of stock, Sobolewski stated that a 51–24½–24½ split would resolve the problem Hiesiger himself had earlier raised of control in a deadlock situation. Hiesiger suggested as more acceptable alternatives an arbitration clause or a buyout provision, and Ms. Cheikes offered to look for other arrangements—an approach, according to Hiesiger, all agreed to. (Tr. 247, 821) No agreement was reached as to how much stock would be owned by the respective parties. (Tr. 706)

When the question of earnings was raised, Sobolewski said Kenyon should have a salary ($50,000 annually was suggested) plus a percentage of gross revenues since he would be running the day-to-day operation of the company. Hiesiger testified that the parties "had never said that somebody devoting full-time to the business couldn't be provided for by way of salary, and that that was certainly an open question, but that until now no provision had been made for anyone of us to receive a salary, and that beyond that we had provided for Larry to have a business of his own with the Gelaendewagen with Arthur's assistance and my assistance in Colorado." (Tr. 249) It appears there was no resolution of that issue.

Sobolewski suggested that there be five directors—the three parties plus two others elected by Kenyon. Hiesiger would not yield since that solution "effectively ... gave control to Larry." (Tr. 249) The record indicates that this issue was not resolved. On the question of the role of Elco Parts Company in supplying the needed components, there was further disagreement; according to Hiesiger, Cheikes said "that certainly some effective way would have to be arrived at so that Elco Parts

Company would be appropriately supplying and seeking to sell the kits ... in the situation.... But it was an area certainly where some protection had to be afforded to Kenyon Corporation vis-a-vis Elco Parts Corporation." (Tr. 250–51) Finally, the parties discussed without resolution the question of transferring stock. (Tr. 251)

Although many issues were clearly unresolved at the close of the meeting, Hiesiger and Ellis somehow believed they "still had the same deal." (Tr. 251) Hiesiger was looking forward to proceeding along equivalent lines to those originally mapped out.

The next morning Ellis was at Hiesiger's home and received a telephone call from Kenyon. Ellis testified that Kenyon wanted to come to an understanding with Ellis and work things out. Ellis agreed; he told Kenyon he "didn't think that [Kenyon] really needed attorneys such as these, they are just messing things up, and it is not my general practice. I am a man of my word ... and I told Mr. Kenyon that when I shook hands on it, that I would do what I said I would do and I expected him to do the same thing. Whereupon he said, 'I agree with you, ... I will be back in touch with you....' " (Tr. 656–57, 823)

Hiesiger testified that on June 7, 1984, he received a telephone call from Ellis in which Ellis reported that Kenyon was disappointed with the May 18th meeting and had told Ellis, "let's proceed ahead, we have got a good thing going." (Tr. 280) Accordingly, Hiesiger and Ellis agreed to give Kenyon a check for $10,000 representing the $5,000 that each had said on February 17th they would pay for their 25 percent shares of KCA. Hiesiger asked Mr. Ciliberto, the rent-controlled tenant in the Manhattan apartment building where Kenyon was staying, to deliver the check to Kenyon or put it under his door. (Tr. 253) The $10,000 check (Ex. 36) was placed under Kenyon's door. (Tr. 253)

Soon thereafter, Kenyon called Ellis to tell him he had taken the "mule" car to the EPA and it had passed certification. (Tr. 660) He did not call Hiesiger to so inform him.

Kenyon received the $10,000 check but never attempted to cash or negotiate it. (Tr. 824) When Hiesiger learned from someone at ATL (Tr. 265) that Kenyon had obtained a certificate of conformity and had not notified him that he had taken the car to the EPA or that it had passed, he stopped payment on June 25, 1984 (Tr. 261) of the $10,000 check. (Tr. 256; Ex. 34)

On July 6, Hiesiger coincidentally ran into Kenyon on the street in Greenwich Village. (Tr. 267) In a very brief conversation, Kenyon informed Hiesiger that the "mule" car had passed certification. (Tr. 268, 822) Three days later, Hiesiger received a letter from Bloom returning the $10,000 check on the ground that "[t]here has clearly and unequivocally never been a meeting of the minds." (Ex. 35) Extremely angry, Hiesiger called Kenyon and Bloom and without restraint expressed his feelings. (Tr. 270–73) On July 30, 1984, Hiesiger commenced the instant lawsuit.

Subsequently, Ellis called Bloom "so that [Ellis] could try to bring [Ellis and Kenyon] back together ... I was not interested in being part of a lawsuit." (Tr. 670; Ex. 130 at 32–34) During that conversation, Ellis took the position that there had not been a deal between him, Hiesiger and Kenyon. (Tr. 672) According to Bloom who tape-recorded the conversation (Ex. 130 at 32), Ellis said "that there was no deal between Ellis, Hiesiger and Kenyon, and that in his mind there was only one agreement, and that was to be one with him and Larry Kenyon themselves without Mr. Hiesiger being involved ... that there was never a deal where there would be a 50–25–25 split of stock." (Id. at 33–34) The two unsuccessfully tried contacting each other further; Ellis thereafter became a party to the lawsuit. (Tr. 671)

It should also be noted that on about June 15, 1984, Hiesiger applied to EPA for Small Volume Manufacturer Certification designation for International Motors. (Tr. 254) In July 1984, International Motors received that designation. In December 1984, the company received a certificate of conformity through the efforts of Ellis for

the Mercedes-Benz 500 for the model years 1984 and 1985. (Tr. 255) Since then until the present, International Motors has been carrying on business selling certification kits based on its certificate of conformity. (Tr. 255) Hiesiger pursued this course because he thought "that Larry saying everything is A-okay is a smoke screen. I still feel that having acted this way until now, something will happen to push us out of the deal, and what I would want to do is go after my own certificate in the event that that occurs." (Tr. 255-56)

On August 7, 1984, a certificate of conformity was issued by the EPA to KCA for four types of vehicles. (Ex. 9) A second certificate was issued on January 18, 1985. (Ex. 10)

## DISCUSSION

Before addressing the substantive legal issues in this case, we note defendants' argument in their post-trial memorandum (citing no authority) that the complaint should be dismissed against Kenyon individually. We disagree. Plaintiffs assert valid causes of action, finding support in the trial record, against both defendants. Consequently, we decline to dismiss the complaint against Kenyon individually.

### Intent to be Bound

Plaintiffs claim that defendants breached an oral joint venture agreement allegedly formed among the parties over the course of several meetings held during the winter of 1983-84 and solidified at a meeting held on *February 17, 1984;* they contend that the written agreements Bloom was requested to prepare were merely intended to memorialize their binding oral agreement. Defendants take the position that no oral joint venture agreement ever existed; that the meetings held among the parties were no more than negotiations that never materialized into an agreement; and that the agreements Bloom was requested to prepare were to serve only as a framework for further negotiations between the parties.

It is a well-settled rule of law that if parties intend not to be bound until a written contract is fully executed, there will be no binding agreement until that event takes place. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985); *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 261 (2d Cir.1984), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Jillcy Film Enterprises, Inc. v. Home Box Office, Inc.,* 593 F.Supp. 515, 519 (S.D.N.Y. 1984); *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980), *aff'd,* 694 F.2d 289 (2d Cir.1982); *Scheck v. Francis,* 26 N.Y.2d 466, 469, 311 N.Y.S. 841, 843, 269 N.E.2d 493, 494 (1970). This is true even if the parties have orally agreed to all of the terms. *R.G. Group, supra,* at 74; *Jillcy, supra,* at 519; *Chromalloy, supra,* at 550; *Schwartz v. Greenberg,* 304 N.Y. 250, 254, 107 N.E.2d 65, 67 (1952).

The policy behind this rule is sound: a party should be free to negotiate candidly, secure in the knowledge that he will not be bound until the execution of a document all parties consider to be final. *Winston, supra,* at 80; *R.G. Group, supra,* at 75. It is for this reason that written contracts are the norm, not the exception—especially with respect to complicated business deals. *R.G. Group, supra,* at 75. Indeed, Judge Friendly has stated that

> most such potential contractors ... view the signed written instrument that is in prospect as 'the contract,' not as a memorialization of an oral agreement previously reached.... [W]hen the parties have manifested an intention that their relations should be embodied in an elaborate signed contract, clear and convincing proof is required to show that they meant to be bound before the contract is signed and delivered.

*International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 57-58 (2d Cir.1979) (Friendly, J., concurring).

Of course, individuals may be bound by an informal oral agreement if they so desire. *R.G. Group, supra,* at 74 (citing 1 A. Corbin, Contracts § 30 at 98 (1963)). Thus, to determine if an oral agreement becomes legally binding, the intent of the parties is of central importance. *Jillcy, supra,* at 520 (citing *Reprosystem, supra,* at 261–62). In short, our initial inquiry is whether the parties intended a written document prepared at their request to be a mere memorialization of an already binding oral agreement, or whether they intended to be bound only upon execution of a formal, written instrument. *See Winston, supra,* at 80; *R.G. Group, supra,* at 74; *V'Soske, supra,* at 499.

Our determination rests upon a consideration of four factors: (1) reservation of right; (2) agreement on all terms; (3) complexity and magnitude of the contracts; and (4) partial performance. *Winston, supra,* at 80; *R.G. Group, supra,* at 75–76. Although "[N]o single factor is decisive," all four must be balanced to determine whether the parties intended to be bound prior to the formal execution of an agreement. *R.G. Group, supra,* at 75; *see Winston, supra,* at 80. We now proceed to examine each element seriatum.

The first factor is a party's reservation of his right to be bound only upon formal execution. Such a reservation may be expressed or implied from a party's words or actions, or from the language in any correspondence, etc. between the parties. *See, e.g., Winston, supra,* at 81 ("Although neither party expressly reserved [this] right ..., language in the correspondence does reveal such an intent."); *R.G. Group, supra,* at 76 (letter referring to negotiations " 'designed to resolve outstanding issues and to reduce our agreement to writing' " evidenced reservation of right despite telephone conversation referring to an oral "handshake agreement"); *ABC Trading Co., Ltd. v. Westinghouse Electric Supply Co.,* 382 F.Supp. 600, 602 (E.D.N.Y.1974) (letter stating "If your client finds this proposal agreeable in principle, we can proceed to reduce it to writing" constituted conclusive evidence of defendant's reserva-

tion of right); *Chromalloy, supra,* at 550 ("In both *Scheck, supra,* and *Schwartz, supra,* the existence of written contracts, in one case unsigned, in the other undelivered, was conclusive evidence of such an intent. [Similarly,] [i]n this case, a series of draft agreements were drawn up but never executed.")

In the instant case, defendants claim that they expressly reserved the right not to be bound until any agreement among the parties was put into writing and approved by their law firm (Tr. 787, 796; Ex. 130 at 18); plaintiffs, on the other hand, contend that the parties intended to be bound with or without any written agreement.

Kenyon testified that at the February 17, 1984 meeting, he told Hiesiger he would have to discuss everything with Bloom, his lawyer, since Hiesiger was an attorney and Kenyon felt his interests should be represented by counsel; Hiesiger agreed, according to Kenyon. (Tr. 796) Further, Bloom deposed that he informed Hiesiger in their telephone conversation at the close of the February 17 meeting that "any arrangement ... would have to be in writing and approved by this firm" (Ex. 130 at 18)—a requirement to which, according to Bloom, Hiesiger agreed. (Tr. 799) Hiesiger, on the other hand, denied ever being told about these conditions. (Tr. 402–03)

It is our opinion, and we so find, bolstered by plaintiffs' own words and acts, that, as defendants claim, they reserved the right not to be bound until a formal contract was entered into. Our conclusion finds support in the very fact that Bloom was telephoned at the close of the February 17 meeting. Indeed, Hiesiger himself insisted that the content of the parties' discussions that day "be translated into a more formal document by Mr. Bloom...." (Tr. 181) In the presence of all three parties, Hiesiger spoke with Bloom on the telephone, explaining the parties' desire "to put this in formal form as quickly as possible so that there would be no further possibility of misunderstanding between the parties." (Tr. 191)

It is apparent to us that Hiesiger wanted to take advantage of the drafting process as a way to clarify and finalize the terms discussed by the parties. For instance, Hiesiger pointed out a serious potential problem area in the terms discussed at the February 17 meeting that he wished Bloom to work out for the parties: he anticipated that the sale of 25 percent of KCA stock to both Hiesiger and Ellis could result in a deadlock between Kenyon, on the one hand, and Hiesiger and Ellis, on the other. After offering a possible solution, *i.e.,* an arbitration clause, Hiesiger suggested that Bloom's firm "bend its efforts to some other method...." (Tr. 191–92) Clearly, not only the defendants, but Hiesiger as well, believed that there were still issues to be resolved through the drafting process before the agreement achieved finality.

In this context, we note the recent observation by our Circuit Court of Appeals:

> The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussions will be pinned down when the understanding is reduced to writing.

*Winston, supra,* at 82 (citing *R.G. Group, supra,* at 75). We entertain no doubt that such considerations motivated Hiesiger's desire to reduce the parties' discussions to a formal writing.

Perhaps the most striking and convincing evidence that the parties did not intend their discussions to constitute a final and binding agreement at the close of the February 17, 1984 meeting—before they were put into a formal contract—comes from the testimony of Ellis. At a meeting between Ellis and Kenyon in late April or early May of 1984 in Texas, Kenyon revealed that he was dissatisfied with their association with Hiesiger. Ellis replied by saying: " ... remember, Larry, we agreed 50–50. You can forget Mr. Hiesiger, let's continue on with our original agreement of 50–50 and Mr. Hiesiger is out." (Tr. 644)

Furthermore, Ellis admitted that in a telephone conversation with Bloom in August, 1984, Ellis said he believed there was never any "deal" between himself, Mr. Hiesiger, and Mr. Kenyon. (Tr. 672). Bloom's deposition testimony corroborates this: "I recall Mr. Ellis telling me that there was no deal between Ellis, Hiesiger and Kenyon, and that in his mind there was only one agreement, and that was to be one with him and Larry Kenyon themselves without Mr. Hiesiger being involved." (Ex. 130 at 33–34) During their conversation, Ellis revealed to Bloom that he still desired an association with Kenyon and proposed some type of 50–50 stock split of KCA between himself and Kenyon. (Ex. 130 at 36)

In short, the trial testimony of Ellis and the actions taken by Hiesiger subsequent to the February 17 meeting demonstrate to us that they did not intend to be bound prior to the execution of a formal, written document.

■ The second factor we must consider in our balancing test is "whether all of the terms of the alleged contract have been agreed upon," *Winston, supra,* at 80, or, phrased differently, "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group, supra,* at 76. The extent to which there is agreement on the terms of a deal, especially the material terms, weighs heavily in support of or against a finding of an intent to be bound prior to execution.

Thus, in cases where the terms are definite and signing is "purely ministerial," *R.G. Group,* at 76; *see Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 149, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979), this factor is strong evidence in favor of finding an intent to be bound prior to a formal execution. Conversely, where terms essential to the proposed deal are unclear or indefinite, a finding of an intent not to be bound without a written contract is likely. *See R.G. Group, supra,* at 76; *V'Soske,*

*supra,* at at 500. Even where points of disagreement are not "of any substance" and an "oral agreement was actually reached on all of the remaining terms," the parties are not necessarily bound by the oral agreement. *Winston, supra,* at 82.

We now examine this second factor in the context of the instant case. Throughout the winter of 1983–84, the parties discussed working together in order to develop and commercially exploit the technology needed to modify foreign automobiles to EPA standards. At the conclusion of their February 17, 1984 meeting, although the parties had come to substantial agreement on several of the proposed terms, many of prime importance were left unresolved. Those terms agreed upon by all parties were the following, *inter alia:* Hiesiger would find an apartment he could lease to Kenyon; Kenyon's mother would receive profits made on KCA's test automobile; Elco Parts Co. would supply components for the parties' project; Kenyon would serve as consultant to Elco for a $5000 finder's fee; and Texas Coach would purchase certain inventory from KCA.

Among those terms left unclear were two of the most essential terms of any joint venture agreement: first, how profits would be shared, and second, whether Hiesiger and Ellis would assume the risks and liabilities of KCA, in which they intended to purchase stock. With respect to the first item, both plaintiffs testified that Kenyon had agreed to sell 25 percent of KCA stock for $5,000 to Hiesiger and 25 percent to Ellis at the same price, keeping 50 percent for himself. (Tr. 166, 601) Although Kenyon denies such an agreement, his own notes written prior to and during the February 17th meeting indicate his intention to sell plaintiffs stock in the same percentages and at the same price claimed by Hiesiger and Ellis. (Ex. 19)

However, as we have already noted, when Hiesiger spoke with Bloom over the telephone at the close of the February 17th meeting, he called to Bloom's attention his reservations about the proposed 50–25–25 stock split; he requested that Bloom's firm find a way to resolve the potential deadlock problem presented by such a split. (Tr. 191–92) Several resolutions were possible, one of which would have involved splitting the stock less evenly. Thus, Hiesiger could not have considered the proposed stock split to be definite.

Moreover, Ellis did not consider the stock split arrangement to be a certain term of the parties' agreement. As we have mentioned hereinabove, Bloom deposed that during his telephone conversation with Ellis in late April or early May of 1984, the latter said "there was never a deal where there would be a 50–25–25 split of stock." (Ex. 130 at 34) This corroborates Ellis' own testimony at trial that he told Kenyon in April, 1984 to "forget Mr. Hiesiger, let's continue on with our original agreement of 50–50," (Tr. 643) referring to their original discussions about joining forces apart from the involvement of Hiesiger.

The second significant term of the proposed deal, the assumption of the risks and liabilities of the alleged joint venture, was also unresolved. On February 17, Kenyon requested that Hiesiger and Ellis assume the risks and liabilities of KCA, through which the joint venture would operate. Kenyon testified that Hiesiger refused, (Tr. 796) whereas Hiesiger claims he agreed to the term. (Tr. 166, 202) Ellis, however, testified that the parties "talked about the liabilities that [Texas Coach] had and the liabilities that KCA had, and decided clearly that those would be shared only ... by us individually." (Tr. 601; Ex. N) It is apparent that the parties entertained different understandings on this point and that no agreement was ever reached.

In sum, we find that the parties could not come to an agreement on at least two essential terms of their understanding and left them unresolved—seemingly to be worked out in a formal agreement, the drafting process of which was set in motion with their telephone call to Bloom on February 17. Consequently, the second factor in the four-part test—whether all of the terms had been agreed upon—must be answered in the negative.

The third factor we must take into account in our analysis is "whether the

agreement at issue is the type of contract that is usually committed to writing," *Winston, supra,* at 80, or, put another way, "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *R.G. Group, supra,* at 76. Evidence that a deal is complex—enough so that it would be unusual to rely on an oral understanding—includes, *inter alia,* the time span of the proposed deal, the amount of detail covered by its terms, and the amount of money at stake, including the amount sought by plaintiffs in any subsequent litigation. *See R.G. Group, supra,* at 77. In a recent Second Circuit case involving a complex, four million dollar business transaction, the Court noted that

> the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.

*Reprosystem, supra,* at 262–63; *see V'Soske, supra,* at 501; *Banking & Trading Corp. v. Floete,* 257 F.2d 765, 769 (2d Cir.1958); 1 A Corbin, *supra,* § 30 at 105–06.

Although the transaction in *Reprosystem* involved a four million dollar sale of six companies located in different countries, it would be incorrect to characterize deals of lesser magnitude as simple. In a recent case, the Second Circuit reversed the lower court's determination that the transaction in question was "relatively simple," explaining that

> ... the $62,500 at issue [here] is not a trifling amount, and payment was to be made over several years.... Although the agreement consisted of only four pages, the parties evidently thought the terms and language used were complex enough to require substantial redrafting.

*Winston, supra,* at 83.

As in *Winston,* many elements of the instant case urge a finding of an intent to be bound only with a final written contract. Although the length of the proposed venture was never specified, due to the complex nature of the business—importing automobiles, converting them, and then selling them—there is a strong likelihood that the arrangement of the parties would have continued over a not insubstantial amount of time.

In addition, the proposed terms of this project were both numerous and varied; they ranged from the sale of components to financing arrangements to the performance of technical procedures. At the February 17th meeting, where plaintiffs claim their oral agreement was solidified on all terms, at least fifteen terms were discussed. When Bloom was asked by the parties to reduce these terms to written form, his firm began preparing six different documents totalling over twenty-five pages. (Tr. 215; Exs. 24, 25, 26, 27, 28) Indeed, as to a telephone call Hiesiger made to Bloom in March, 1984 in order to inquire why the drafts were taking so long to complete, Hiesiger testified: "[Bloom] told me it was a very complex matter.... Mr. Bloom said that this was beyond his ability to handle ... and he had referred it to [a] corporate partner, Mr. Sobolewski...." (Tr. 217)

Further evidence of the magnitude of the proposals by the parties lies in the amounts of money to be transferred among the parties. These transactions were to include the proposed stock sale involving $10,000; Hiesiger's financing the Gelaendewagen project for Kenyon; the purchase of $15,000 worth of KCA parts by Elco; and a finder's fee of $5,000 to be paid to Kenyon for serving as parts consultant to Elco. Certainly, the aggregate sums that the proposed deal involved are not 'trifling;' logic would dictate that a prudent businessperson would require a signed instrument before being bound in such large amounts of money. *See R.G. Group, supra,* at 77 (referring to a writing requirement as "a practical business matter"); *Teleprompter,*

*supra,* at 57 (Friendly, J., concurring) (describing the drafting process and "the realities of the formation of complex business arrangements"); *V'Soske, supra,* at 501 (with respect to a $1,700,000 sale of a business: "these are precisely the kind of matters which any prudent purchaser would with to have resolved before finally committing himself....").

In short, every facet of the proposed deal by the parties—its duration, the great number and level of detail of its terms, and the amounts of money involved—convinces us that this alleged agreement was of a complexity and magnitude sufficient to support a finding that the parties did not intend to be bound by an oral agreement.

The fourth and final factor that we must consider in determining at what point the parties intended to be bound is whether there has been partial performance of the contract. *Winston, supra,* at 80; *R.G. Group, supra,* at 75. "[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group, supra,* at 75–76.

Plaintiffs claim that they rendered partial performance of their alleged joint venture agreement by providing: (1) funds; (2) administrative resources; (3) housing accommodations for Kenyon; and (4) Ellis' significant technical knowledge. (Plaintiffs' Post-Trial Memorandum at 113) We will address each of plaintiffs' claims to determine exactly what performance was rendered and whether any such performance was actually in furtherance of the terms agreed upon by the parties.

With respect to the provision of funds, plaintiffs may be referring to any of several payments. Hiesiger made two payments to Ellis in January, 1984 without Kenyon's knowledge (Tr. 364, 591), even though the larger of the two (for $100,000) was, ac-

cording to Hiesiger, given to enable Ellis to develop a certification system using Kenyon's technology. (Tr. 146–47) We are not at all certain that these monies were not used in connection with projects between Hiesiger and Ellis, unrelated to Kenyon. Furthermore, these transfers were made before the February 17th meeting, when the terms of the parties' understanding were allegedly solidified.

Although certain of the payments discussed at the February 17th meeting were in fact made, *e.g.,* the sale of KCA inventory to Texas Coach (Tr. 211–12; Ex. 22), the major financial terms of the alleged agreement were never carried out. The most significant—the sale of KCA stock—was never effectuated. Although Ellis testified that the payments of $5,000 from Hiesiger and $5,000 from Ellis for 25 percent of the stock each was merely a "token fee," (Tr. 601) no effort was made to pay the $10,000 until their understandings had fallen through. Another substantial term that was never pursued was that Hiesiger was to help Kenyon finance the Gelaendewagen project. In fact, there is no proof that Hiesiger made any payments in furtherance of this proposal. If the parties truly considered themselves bound at this point without a formal written document, what contingency were they awaiting before they proceeded to support the joint venture with financial resources?

Plaintiffs also argue that they provided "administrative resources." We are unsure what performance they allege to be in this category. If plaintiffs are referring to Hiesiger's promises to find an apartment he could lease to Kenyon and to set Kenyon up in the Gelaendewagen project, there is scanty and inconclusive evidence that Hiesiger invested any resources in these endeavors.[4]

Plaintiffs further claim that by allowing Kenyon to use one of Hiesiger's 400 apartments, Hiesiger rendered partial perform-

---

**4.** Furthermore, we find that Hiesiger having provided in September, 1983 a laboratory for Kenyon to work at on Long Island, when they first discussed converting a Mercedes-Benz, does not constitute partial performance of the alleged joint venture, since such work was performed prior to the commencement of the alleged joint venture.

ance in furtherance of the alleged joint venture. With respect to the apartment Hiesiger provided rent-free for Kenyon: First, we note that Hiesiger could not provide Kenyon with a lease on that apartment due to arrangements he had previously made. (Tr. 121) Second, Hiesiger agreed at the February 17th meeting to attempt to find another apartment that he could rent to Kenyon. (Tr. 796–97) There is no evidence that this path was pursued. Third, Kenyon had used this apartment as early as September, 1983, when there was clearly not yet any serious contemplation of a contract between the parties.

With respect to setting Kenyon up in the Gelaendewagen project, although Hiesiger testified that he talked to individuals in Germany about the matter, there is no indication that he performed in any way other than by general discussions.

■ In contrast to what we have heretofore determined with respect to Hiesiger, Ellis did perform by providing technical expertise. In accordance with the February 17th discussions, Ellis performed and paid for the "coast down" procedure. (Tr. 198–99, Ex. 19) Ninety-three hours of his technicians' time was expended working on the car, and Ellis spent five weeks at the ATL center in Ohio working to bring the car to certification level. (Tr. 611–12)

Nonetheless, the facts that Ellis did perform one of the terms discussed by the parties at the February 17th meeting and that KCA inventory was sold to Texas Coach are insufficient to establish that the parties intended to be bound before a written document was executed. In addition to the factor of partial performance, we must consider the three other factors relevant to our determination of intent, *i.e.*, reservation of right, agreement on all terms, and complexity and magnitude of the deal. In the instant case, we find that these three factors (plus the lack of partial performance on numerous terms of their alleged agreement) conclusively support a finding that the parties did not intend to be bound without a writing.

Consequently, we are compelled to conclude the parties did not consider that an oral agreement was reached on February 17, 1984 or that any discussions were to have legal effect, but were instead awaiting the execution of a formal written instrument before they were to be bound in a joint venture. This conclusion is amply supported by the record, in the words and actions of the parties and the nature of the agreement itself. *Cf. Winston, supra,* at 83; *R.G. Group, supra,* at 74. Since the joint venture agreement of the parties never became binding, plaintiffs cannot recover from defendants for breach of that agreement.

### Elements of a Joint Venture

■ Even if we had found that the parties considered themselves bound without a writing, we would be compelled to find that such agreements as were reached by February 17, 1984 were legally insufficient to form a valid joint venture agreement.

Under New York law, a joint venture must contain each of four essential elements: (1) agreement between the parties to create a joint venture; (2) sharing of profits and losses; (3) joint control of the business; and (4) contributions of property, skill or knowledge. *McGhan v. Ebersol,* 608 F.Supp. 277, 282 (S.D.N.Y.1985); *see Sherrier v. Richard,* 564 F.Supp. 448, 457 (S.D.N.Y.1983); *Yonofsky v. Wernick,* 362 F.Supp. 1005, 1030–31 (S.E.N.Y.1973) (citing *U.S. v. Standard Oil,* 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd,* 270 F.2d 50 (2d Cir.1959), in 2 S. Williston, Contracts § 318A at 579 (1959)); *Ramirez v. Goldberg,* 82 A.D.2d 850, 852, 439 N.Y.S.2d 959, 961 (2d Dep't 1981). We find that more than one of these elements are missing from the parties alleged oral agreements, although the absence of even one is fatal to the establishment of a joint venture. We now proceed to examine each element.

The first essential element of a joint venture that we address is the existence of an "agreement manifesting the intent of the parties to be associated as a joint venture." *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495

F.Supp. 544, 549 (S.D.N.Y.1980), *aff'd*, 697 F.2d 289 (2d Cir.1982) (citing *Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1127 (E.D.N.Y.1975), *aff'd*, 553 F.2d 93 (2d Cir.1977)). Intent is crucial because a joint venture "is a voluntary relationship, the origin of which is wholly *ex contractu*, i.e., it is not a status created by law." *Yonofsky, supra*, at 1031. This manifestation of intent need not be explicit, *id.*, at 1031, but the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, *id.*, at 1037, and not a simple contract.

In the instant case, the parties expended much time, energy, and money meeting with eachother in both New York and Texas; their intent to create some kind of an association among themselves, one more involved than a simple contractual relation, was clearly demonstrated. Of equal importance is the nature of the agreement the parties discussed. The terms contemplated at the February 17, 1984 meeting were varied and complex and, if carried out, would have linked the parties to the extent New York law requires of joint venturers:

> The ultimate inquiry is whether the parties have so joined their property, interests, skills, and risks that for the purposes of the particular adventure, their respective contributions have become one and the commingled properties and interest[s] of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit.

*Sherrier, supra*, at 457 (quoting *Hanlon v. Melfi*, 102 Misc.2d 170, 423 N.Y.S.2d 132 (Sup.Ct., Suffolk Co.1979)); *see Stratford Group, Ltd. v. Interstate Bakeries*, 590 F.Supp. 859, 862 (S.D.N.Y.1984); *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 151 N.E.2d 170, 178, 175 N.Y.S.2d 1, 13 (1958), *app. dismissed*, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958) (quoting *Hasday v. Barocas*, 10 Misc.2d 22, 28, 115 N.Y.S.2d 209, 215 (Sup.Ct.N.Y.Co.1952)). We have no doubt that the parties did intend to create such a relationship among themselves, as evidenced by their behavior and by the very nature of the terms they discussed.

Consequently, we find that the parties intended to create a joint venture, although finalized only upon execution of a formal contract, as discussed hereinabove.

The next requisite element of a joint venture is the sharing of profits and losses.

> An indispensable essential of a contract of partnership or joint venture ... is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses.

*Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 151 N.E.2d 170, 178, 175 N.Y.S.2d 1, 13, *app. dismissed*, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958) (citing *Reynolds v. Searle*, 186 A.D. 202, 203, 174 N.Y.S. 137, 138 (1919)); *see Yonofsky, supra*, at 1032. We find this element to be missing from the alleged agreement of the parties herein.

As we have already mentioned several times, although the parties tentatively agreed that the KCA stock would be split 50–25–25 with Kenyon retaining 50 percent, no definite understanding was reached; Hiesiger's telephone call to Bloom suggesting a mechanism be worked out to deal with a deadlock situation indicates a lack of certainty on exactly how the stock would be split and consequently how profits (and losses) would be shared. Furthermore, we note that the parties never otherwise discussed the question of sharing profits and losses. Consequently, this essential element of a joint venture agreement was not present.

The third element required to establish a joint venture is "joint control and management of the business." *Sherrier, supra*, at 457. Had the proposed sale of KCA stock been accomplished, the three parties would have been co-owners of the company through which the venture was to operate. However, the parties did not discuss at the February 17th meeting issues of control and management of KCA; it was not determined who would be the company's directors and officers or who would manage its operations. Although addressed at the

May 18, 1984 meeting, (Ex. 23) they were never resolved. In short, the requisite element of joint control and management was never clearly decided.

The last essential element of a joint venture involves the contribution of each party. "There must be some contribution of property, financial resources, effort, skill or knowledge." *Yonofsky, supra,* at 1031. Among the terms agreed to by the parties at the February 17th meeting were that Hiesiger would provide financial resources, Ellis his technical expertise, and Kenyon his property and salesmanship applied to their venture. This element of a joint venture agreement, therefore, was satisfied.

In sum, even if we were to assume that the parties had intended to be bound without a written contract, since two of the four elements necessary to the existence of a joint venture have not been satisfied, we are constrained to, and do, conclude that no joint venture was formed.

### Unjust Enrichment

Having determined that the parties did not intend to be bound without a formal writing and that in any event, there was no joint venture, we must still go on to decide whether plaintiffs are entitled to any equitable relief.

"Unjust enrichment" is premised on the notion that one should not be allowed to be enriched at the expense of another. *See Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 263 (2d Cir.1984); *Songbird Jet Ltd., Inc. v. Amax, Inc.,* 581 F.Supp. 912, 926 (S.D.N.Y.1984) (Weinfeld, J.). "[W]here the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another," *Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir. 1982) (quoting *Matarese v. Moore-McCormack Lines,* 158 F.2d 631, 634 (2d Cir. 1946) ), the doctrine of unjust enrichment is applicable. The granting of such equitable relief is in the sound discretion of the trial court. *Indyk, supra,* at 57.

In order to recover for unjust enrichment, plaintiffs must prove: (1) defendants were enriched; and (2) such enrichment

was unjust. *Id.; see Reprosystem, supra,* at 263; *Songbird Jet Ltd., supra,* at 926. We have no hesitancy in concluding that both elements were satisfied only with respect to the contribution made by Ellis to KCA's obtaining the two certificates of conformity.

■ Following the parties' February 17, 1984 meeting, 93 hours were expended by Ellis' technicians preparing Kenyon's "mule" car for the coast down test. Subsequently, Ellis spent five weeks at ATL working on bringing the "mule" car to certification level. Although Kenyon was also present over the weeks, he was at the plant considerably less frequently than Ellis. Further, most of the labor and technical work was done by Ellis; clearly he played a much more significant role than Kenyon in developing a certificate automobile.

Of course, Ellis sought to and did gain from the experience apart from the success reached in modifying that particular car. He learned how to develop an emissions system by using the Liphardt components in the configuration worked out while the "mule" car was at ATL. In other words, what Ellis learned was not incidental to Kenyon's test car; he developed a system that could be applied to other automobiles.

Ellis' gained knowledge, however, does not detract from the lengthy period of time he and his technicians spent working toward bringing Kenyon's car to certification level—an effort that led to the success achieved. In that sense, this case differs from *Songbird Jet Ltd., supra,* wherein plaintiffs' services were designed to promote their own interests. *Id.* at 927. Here, Ellis' services were designed to benefit KCA.

Since a certificate of conformity was issued to KCA, defendants were clearly enriched. Further, since the certificate would not have been obtained without the efforts expended by Ellis, we find that such enrichment, which provided no monetary award

to the person who bore most of the responsibility for the success, to wit, Ellis, was unjust. *See Reprosystem, supra,* at 263; *Songbird Jet Ltd., supra,* at 926. Finally, we note that Kenyon's enrichment was at Ellis' expense. *See Dolmetta v. Uintah National Corp.,* 712 F.2d 15, 20 (2d Cir. 1983). In short, the circumstances herein convince us that "in equity and good conscience the defendant[s] should return [the portion of] the money or property" earned by Ellis' work. *Id.*

We do not reach the same conclusion concerning Hiesiger. Unlike Ellis, we find that he did not contribute toward the success of KCA. Although Hiesiger gave Ellis $100,000 in January 1984 while Ellis was developing the Liphardt system, Kenyon was never even informed of that transaction. We are not at all certain that the money was not used instead to promote other ventures between Ellis and Hiesiger apart from the project with Kenyon. Indeed, Hiesiger himself answered "No" when he was asked on cross-examination, "Was this $100,000 collateral or money that you advanced an obligation of the joint venture?" (Tr. 346)

We feel similarly with respect to the check for $15,055.41 written by Hiesiger on the account of PTL to KCA for parts sold to Texas Coach Company. If a benefit was conferred on any party as a result of that transaction, the true beneficiary was Ellis, who received components paid for by a company owned by Hiesiger.

Finally, we do not believe that Kenyon's rent-free use of Hiesiger's Manhattan apartment can be the basis of Hiesiger's recovery in unjust enrichment. Although Kenyon certainly benefited from that situation, it was at no expense to Hiesiger who could not accept rent for the apartment because of other arrangements he had entered into. (Tr. 796–97)

Accordingly, we find that Kenyon and KCA were not unjustly enriched at Hiesiger's expense. However, it is our conclusion that defendants were so enriched at the expense of Ellis who may recover the portion of the money his services earned.

## UNCONVINCING TESTIMONY

Our obligation compels us to emphasize that we find unconvincing certain extremely vital portions of the trial testimony given by the witnesses Hiesiger and to a lesser degree Kenyon. In sharp contrast, that adduced by the witness Ellis was, in the main, of convincing nature.

## CONCLUSION

For the reasons hereinabove presented, the complaint is dismissed in its entirety except as to the following: Plaintiff Ellis is entitled to recover from defendants the portion of money earned by his services in connection with certifying KCA's "mule" car. Before ordering a trial on damages with respect thereto, we proceed to follow a practice our Court has successfully employed for a long time: We direct the parties to endeavor to agree on a reasonable and proper amount of damages, then to provide us with a proposed form of judgment including such amount agreed upon. If no agreement thereon is reached within 60 days from the filing date of this opinion, the parties are to so notify us in writing and a date will be set for the trial on damages strictly limited to Mr. Ellis and solely to the extent set forth in this paragraph.

SO ORDERED.